UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

FREDERICK H. PHELPS,

                Plaintiff,

v.                                                        1:13-CV-1510
                                                         (GTS/CFH)
MAUREEN BOSCO, Exec. Dir. of Cent. N.Y.
Psychiatric Ctr; MARGARET C. DRAKE, Assist.
Counsel, N.Y. State Office of Mental Health;
N.Y. STATE OFFICE OF MENTAL HEALTH;
N.Y. STATE DIV. OF CRIM. JUSTICE SERVS.;
FED. BUREAU OF INVESTIG. CRIM. JUSTICE
INFO. SERVS.; NAT'L INSTANT BACKGROUND
CHECK SYS.; U.S. DEP'T OF JUSTICE; ERIC
HOLDER, U.S. Att'y Gen.; and ROBERT
MUELLER, III, Dir. of Fed. Bureau of Investig.,

                Defendants.
_____

APPEARANCES:                                             OF COUNSEL:

OLIVER LAW OFFICE                                        LEWIS B. OLIVER, JR., ESQ.
  Counsel for Plaintiff
156 Madison Avenue
Albany, NY 12202

HON. ERIC T. SCHNEIDERMAN                                ADRIENNE J. KERWIN, ESQ.
Attorney General of the State of New York               Assistant Attorney General
  Counsel for State Defendants
The Capitol
Albany, NY 12224

U.S. DEP'T OF JUSTICE                                    DANIEL M. RIESS, ESQ.
  Counsel for Federal Defendants                         Trial Attorney
Civil Division, Rm. 6122
20 Massachusetts Avenue, NW
Washington, D.C. 20530

GLENN T. SUDDABY, Chief United States District Judge

## <u>DECISION and ORDER</u>

Currently before the Court, in this civil rights action filed by Frederick H. Phelps ("Plaintiff") against the four above-described state employees and agencies ("the State Defendants") and the five above-described federal employees and agencies ("the Federal Defendants"), are the following four motions: (1) the Federal Defendants' motion for summary judgment; (2) Plaintiff's cross-motion for summary judgment against the Federal Defendants; (3) the State Defendants' motion for summary judgment; and (4) Plaintiff's cross-motion for summary judgment against the State Defendants. (Dkt. Nos. 79, 81, 94.) For the reasons set forth below, the Federal Defendants' motion for summary judgment is granted; Plaintiff's cross-motion for summary judgment against the Federal Defendants is denied; the State Defendants' motion for summary judgment granted; and Plaintiff's cross-motion for summary judgment against the State Defendants is denied.

# TABLE OF CONTENTS

I.     RELEVANT BACKGROUND.................................................................4

    A.   Summary of Plaintiff's Claims.................................................4

    B.   Briefing of Federal Defendants' Motion for Summary Judgment........................5

        1.   Federal Defendants' Statement of Undisputed Material Facts................5

        2.   Summary of Federal Defendants' Memorandum of Law.....................9

        3.   Summary of Plaintiff's Opposition Memorandum of Law...................10

        4.   Summary of Federal Defendants' Reply Memorandum of Law.................................................11

    C.   Briefing of Plaintiff's Cross-Motion for Summary Judgment Against Federal Defendants..............................................12

        1.   Plaintiff's Statement of Undisputed Material Facts (Regarding Federal Defendants)......................................12

        2.   Summary of Plaintiff's Memorandum of Law and the Federal Defendants' Opposition Memorandum of Law........................18

    D.   Briefing of State Defendants' Motion for Summary Judgment........................19

        1.   State Defendants' Statement of Undisputed Material Facts...................19

        2.   Summary of State Defendants' Memorandum of Law.............................34

        3.   Summary of Plaintiff's Opposition Memorandum of Law.....................35

        4.   Summary of State Defendants' Reply Memorandum of Law...................36

    E.   Briefing of Plaintiff's Cross-Motion for Summary Judgment Against State Defendants............................................38

        1.   Plaintiff's Statement of Undisputed Material Facts (Regarding State Defendants).........................................38

        2.   Summary of Plaintiff's Memorandum of Law and the State Defendants' Opposition Memorandum of Law.........................51

        3.   Summary of Plaintiff's Reply Memorandum of Law.............................51

II.    GOVERNING LEGAL STANDARDS........................................................52

    A.   Legal Standard Governing Motion for Summary Judgment.............................52

    B.   Legal Standards Governing Plaintiff's Claims....................................54

III.   ANALYSIS..............................................................................55

    A.   Federal Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment Against Federal Defendants....................55

    B.   State Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment Against State Defendants........................59

# I.     RELEVANT BACKGROUND

## A.     Summary of Plaintiff's Claims

Following the Court's Decision and Order of March 26, 2015, the following three claims from Plaintiff's Complaint survive Defendants' prior two motions to dismiss for failure to state a claim: (1) Plaintiff's claim pursuant to 18 U.S.C. § 925A, for a judgment declaring that he has never been "committed to a mental institution" for the purpose of the relevant provision of the Federal Gun Control Act, 18 U.S.C. § 922(g)(4), and directing the National Instant Criminal Background System to remove from its records the statement that he has been so committed, to the extent that the claim (a) is asserted against the Federal Defendants and/or (b) is asserted against Defendants Drake and Bosco in their official capacities; (2) Plaintiff's claim pursuant to 18 U.S.C. § 1983, for recklessly misinterpreting the term "committed to a mental institution" under 18 U.S.C. § 922(g)(4) as including a five-day admission to the Central New York Psychiatric Center in 1996 for an evaluation pursuant to N.Y. Mental Hygiene Law § 9.37(a), in violation of his right to keep and bear arms under the Second Amendment, to the extent that the claim is asserted against Defendant Bosco in her individual capacity and requests monetary relief; and (3) Plaintiff's claim pursuant to 18 U.S.C. § 1983, for recklessly implementing a policy that fails to distinguish between an individual who has been admitted to a mental institution for an evaluation pursuant to N.Y. Mental Hygiene Law § 9.37(a) and a person who has been "committed" to such an institution within the meaning of 18 U.S.C. § 922(g)(4), in violation of his right to keep and bear arms under the Second Amendment, to the extent that the claim (a) is asserted against Defendants Drake and Bosco in their individual capacity or (b) is asserted against Defendants Drake and Bosco in their official capacities and requests injunctive

relief.  *Phelps v. Bosco*, 13-CV-1510, 2015 WL 1399051, at *12 (N.D.N.Y. March 26, 2015)

(Suddaby, J.).  (*See also* Dkt. No. 1.)

For the sake of brevity, the Court will not summarize the factual allegations upon which

these claims are based, but will respectfully refer the reader to Part I.A. of the Court's Decision

and Order of March 26, 2015, which accurately summarizes those factual allegations.  *Phelps*,

2015 WL 1399051, at *1-3.

### B.      Briefing of Federal Defendants' Motion for Summary Judgment

### 1.      Federal Defendants' Statement of Undisputed Material Facts

Generally, unless otherwise noted, the following facts have been found to be material by

the Court, asserted and supported with accurate record citations by the Federal Defendants in

their Statement of Material Facts ("Rule 7.1 Statement") and either expressly admitted by

Plaintiff or denied without an accurate record citation in his response thereto ("Rule 7.1

Response").  (*Compare* Dkt. No. 79, Attach. 3 [Fed. Defs.' Rule 7.1 Statement] *with* Dkt. No. 94,

Attach. 3 [Plf.'s Rule 7.1 Response].)

1.      On or about August 30, 1996, Plaintiff was admitted for examination and

evaluation at the Central New York Psychiatric Center ("CNYPC") in Marcy, New York.[1]

2.      On February 25, 2005, Michael O'Leary, Director of Community Services for

Columbia County, completed an application for Plaintiff's emergency or C.P.E.P.

(Comprehensive Psychiatric Emergency Program) admission to Columbia Memorial Hospital in

Hudson, NY, pursuant to N.Y. Mental Hygiene Law §§ 9.41, 9.55 and 9.57, because Plaintiff

---

[1]      (Dkt. No. 1, at ¶¶ 45, 55, 71, 82 [Plf.'s Compl.]; Dkt. No. 1, Attach. 1, at 15 [Ex.
H to Plf.'s Compl.].)

"ha[d] a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to him[self] or others."[2]

3.      Later on February 25, 2005, Plaintiff was admitted to Columbia Memorial Hospital.

4.      According to a hospital admission assessment dated February 25, 2005, upon his admission to Columbia Memorial Hospital, Plaintiff "was brought in via a pick up order issued by Michael O'Leary from Columbia County Mental Health after he apparently had begun threatening public officials and had reportedly stated he had intentions of killing them this week."[3]

5.      On February 25, 2005, Dr. Richard Tobey, a physician in the Emergency Department at Columbia Memorial Hospital, examined Plaintiff and completed a certificate in which he found, in part, that Plaintiff "is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill" and that, "as a result of his or her mental illness, [Plaintiff] poses a substantial threat of harm to self or others."[4]

6.      Dr. Richard Tobey also stated that Plaintiff had been given a copy of a written notice stating, in part, that (a) he has been admitted as an emergency-status patient to the hospital, (b) within forty-eight (48) hours of Plaintiff's admission he will be examined by another physician who would be a member of the hospital's psychiatric staff, and (c) if the second

---

[2]      (Dkt. No. 80, Attach. 1, at 2 [Form for Emergency or C.P.E.P. Admission].)

[3]      (Dkt. No. 80, Attach. 2, at 6 [attaching page 1 of Columbia Mem'l Hosp. Admission Assessment dated Feb. 25, 2005].)

[4]      (Dkt. No. 82, Attach. 2, at 15 [attaching Certificate of Examining Physician dated Feb. 25, 2005].)

physician confirms the first physician's findings Plaintiff may be kept in the hospital for a total of up to fifteen (15) days from the date of his arrival.[5]

7.      Dr. Tobey further stated that Plaintiff had been given a copy of a written notice stating, in part, that (a) if he believes he does not need immediate observation, care and treatment then he (or persons acting on his behalf) may make a written request for a court hearing, (b) such a hearing will take place as soon as possible within five (5) days of the request, and (c) copies of such a request will be forwarded by the hospital director to the appropriate court and to New York's Mental Hygiene Legal Service.[6]

8.      The earlier-referenced hospital admission assessment dated February 25, 2005, was performed by Dr. Richard Plotkin, M.D.

9.      In the admission assessment, Dr. Plotkin (through Nurse Practitioner Sara Heimroth) stated, at the end of the section entitled "History of Presenting Illness," as follows: "In the ER, the patient continued to present as quite psychotic, unable to give clear, logical, organized thoughts or responses and in need of psychiatric stabilization."[7]

10.      In the admission assessment, Dr. Plotkin (again, through Nurse Practitioner Heimroth) stated that Plaintiff's "Diagnosis on Admission" was "Psychotic Disorder; NOS [not otherwise stated]; PTSD [post-traumatic stress disorder]; Intermittent Explosive Disorder."[8]

---

[5]      (Dkt. No. 80, Attach. 2, at 13 [attaching Notice of Status of Rights].)

[6]      (Dkt. No. 80, Attach. 2, at 13 [attaching Notice of Status of Rights].)

[7]      (Dkt. No. 80, Attach. 2, at 6 [attaching page 1 of Columbia Mem'l Hosp. Admission Assessment dated Feb. 25, 2005].)

[8]      (Dkt. No. 80, Attach. 2, at 7 [attaching page 2 of Columbia Mem'l Hosp. Admission Assessment dated Feb. 25, 2005].)

11.     In a separate document, entitled "Psychiatrist's Admitting Orders" and dated

February 25, 2005, Dr. Richard Plotkin listed his "Diagnostic Impressions" as "PTSD,

Intermittent Explosive DO," "NPD [narcissistic personality disorder]" and "Chronic mental

health problems."[9]

12.     In a Report of Consultation dated February 28, 2005, Dr. Plotkin was listed as

Plaintiff's attending physician at Columbia Memorial Hospital.[10]

13.     At approximately 8:00 a.m. on February 26, 2005, Plaintiff signed a written

request for a court hearing to be discharged from Columbia Memorial Hospital.

14.     At approximately 2:20 p.m. on March 4, 2005, Plaintiff signed a written

withdrawal of his request for a court hearing.[11]

15.     On February 28, 2005, Dr. Plotkin consulted with Dr. Charles Johnson, a doctor

of osteopathic medicine, regarding Plaintiff.

16.     In his Report of Consultation, Dr. Charles Johnson repeated the diagnosis of

---

[9]     (Dkt. No. 80, Attach. 2, at 10 [attaching page 1 of Columbia Mem'l Hosp. Psychiatrist's Admitting Orders dated Feb. 25, 2005].)

[10]    (Dkt. No. 80, Attach. 2, at 8-9 [Report of Consultation dated Feb. 28, 2005].)

[11]    (Dkt. No. 80, Attach. 2, at 12 [Rescission of Request for Discharge dated March 4, 2005].)  The Court notes that, although in his response Plaintiff asserts that he did so because "one of the doctors at Columbia Memorial Hospital told him that he was going to discharge me to the Columbia County Jail before there would be a court hearing, and he suggested that I should withdraw my request for a hearing," he does not provide a specific record citation in support of that assertion.  (Dkt. No. 94, Attach. 3, at ¶ 14 [Plf.'s Rule 7.1 Response].)  Moreover, such an assertion is inappropriate in Rule 7.1 Response because the Federal Defendants never asserted a contrary fact in their Rule 7.1 Statement.  (Dkt. No. 79, Attach. 3, at ¶ 14 [Fed. Defs.' Rule 7.1 Statement].)

Plaintiff as suffering from narcissistic personality disorder and post-traumatic stress disorder.[12]

17.     On March 7, 2005, Plaintiff was discharged from Columbia Memorial Hospital.

18.     On February 21 and April 24, 2013, Plaintiff tried to purchase firearms from federal firearms licensees in New York.

19.     The federal firearms licensees from which Plaintiff tried to purchase firearms informed Plaintiff that he was ineligible to possess a firearm under the Gun Control Act.

20.     In letters to Plaintiff dated March 4 and April 30, 2013, the Federal Bureau of Investigation ("FBI") stated that 18 U.S.C. § 922(g)(4) prohibited Plaintiff from possessing a firearm.[13]

### 2.     Summary of Federal Defendants' Memorandum of Law

Generally, in their memorandum of law, the Federal Defendants argue that the Court should enter judgment for them on Plaintiff's first claim because his admission to, and involuntary retention at, Columbia Memorial Hospital for ten days in 2005 pursuant to N.Y. Mental Hygiene Law § 9.39 constituted a "commit[ment] to a mental institution" for purposes of 18 U.S.C. § 922(g)(4).  (Dkt. No. 79, Attach. 2, at 10-12 [attaching page "8" through "10" of

---

[12]     (Dkt. No. 80, Attach. 2, at 9 [attaching page 2 of Report of Consultation dated Feb. 28, 2005.)

[13]     (Dkt. No. 1, at ¶¶ 27, 31 [Plf.'s Compl.]; Dkt. No. 1, Attach. 1, at 4-6, 10-11 [Exs. B and D to Plf.'s Compl.].)  The Court notes that, although in his response Plaintiff asserts that the prohibition of possessing a firearm stated by the FBI pursuant to 18 U.S.C. § 922(g)(4) had nothing to do with his temporary admission for observation to Columbia Memorial Hospital in 2005, but his admission to Central New York Psychiatric Center on August 30, 1996, Plaintiff does not provide a record citation in support of that assertion.  (Dkt. No. 94, Attach. 3, at ¶ 20 [Plf.'s Rule 7.1 Response].)  Moreover, such an assertion is inappropriate because the Federal Defendants never asserted a contrary fact in their Rule 7.1 Statement.  (Dkt. No. 79, Attach. 3, at ¶ 20 [Fed. Defs.' Rule 7.1 Statement].)

Fed. Defs.' Memo. of Law].)  More specifically, the Federal Defendants argue that (1) Plaintiff's admission and retention included the procedural protections required by the Second Circuit in *United States v. Waters*, 23 F.3d 29 (2d Cir. 1994), and (2) New York State courts have four times referred to hospitalization pursuant to  N.Y. Mental Hygiene Law § 9.39 as a "commitment."  (Dkt. No. 79, Attach. 2, at 10-12 [attaching page "8" through "10" of Fed. Defs.' Memo. of Law].)

### 3.     Summary of Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff argues that the Court should not enter judgment for the federal Defendants on Plaintiff's first claim, because (a) in its Decision and Order of March 26, 2015, the Court correctly held that Plaintiff's 1996 admission to the CNYPC pursuant to N.Y. Mental Hygiene Law § 9.37 was not  a "commitment" within the meaning of 18 U.S.C. § 922(g)(4), and (b) Plaintiff's admission to Columbia Memorial Hospital in 2005 pursuant to N.Y. Mental Hygiene Law § 9.39 was for observation and evaluation only and thus did not constitute a "commitment" within the meaning of 18 U.S.C. § 922(g)(4).  (Dkt. No. 94, Attach. 10, at 4-6 [attaching pages "4" through "6" of Plf.'s Opp'n Memo. of Law].) More specifically, Plaintiff argues that, in its Decision and Order of March 26, 2015, the Court stated that "[a]n admission pursuant to N.Y. Mental Hyg. Law § 9.39 does not appear to constitute a 'commitment' to a mental institution for purposes of 18 U.S.C. § 922(g)(4) . . . ." (Dkt. No. 94, Attach. 10, at 4 [attaching page "4" of Plf.'s Opp'n Memo. of Law].)  *See also Phelps v. Bosco*, 13-CV-1510, 2015 WL 1399051, at *12 (N.D.N.Y. March 26, 2015) (Suddaby, J.).  Plaintiff further argues that (1) Plaintiff was never treated at Columbia Memorial Hospital, and (2) the only psychiatrist who examined him (Dr. Plotkin) discharged him five days short of

the fifteen-day maximum period of retention.  (Dkt. No. 94, Attach. 10, at 4-5 [attaching pages "4" and "5" of Plf.'s Opp'n Memo. of Law].)

### 4.    Summary of Federal Defendants Reply Memorandum of Law

Generally, in their reply memorandum of law, the Federal Defendants repeats their argument in their memorandum of law in chief, and further assert three arguments.  (Dkt. No. 97, at 2-7 [attaching pages "1" through "6" of Fed. Defs.' Reply Memo. of Law].)  First, the Federal Defendants argue that, pursuant to the substantive-type of analytical approach used by the Second Circuit in *United States v. Waters*, 23 F.3d 29 (2d Cir. 1994), the second finding required by N.Y. Mental Hygiene Law § 9.39 need not be rendered through the use of a form certificate but need only be rendered by a psychiatrist and conclude (after examination) that the person whose admission is sought has a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.  (Dkt. No. 97, at 2-4 [attaching pages "1" through "3" of Fed. Defs.' Reply Memo. of Law].)  Second, the Federal Defendants argue that, because no formal judicial proceeding was required under New York State law for Plaintiff's hospitalization at Columbia Memorial Hospital, whether it used the term "admission" or a "commitment," N.Y. Mental Hygiene Law § 9.39 established a commitment procedure under New York State law.  (*Id*. at 5-6 [attaching pages "4" and "5" of Fed. Defs.' Reply Memo. of Law].)  Third, the Federal Defendants argue, rather than feel that he would lose a retention hearing, Dr. Plotkin felt merely that he would lose a *Rivers* Hearing to force Plaintiff to take antipsychotic drugs.  (*Id*. at 7 [attaching page "6" of Fed. Defs.' Reply

Memo. of Law].)[14]

### C. Briefing of Plaintiff's Cross-Motion for Summary Judgment Against Federal Defendants

#### 1. Plaintiff's Statement of Undisputed Material Facts (Regarding Federal Defendants)

Generally, unless otherwise noted, the following facts have been found to be material by the Court, asserted and supported with accurate record citations by Plaintiff in his Statement of Material Facts ("Rule 7.1 Statement") and either expressly admitted by the Federal Defendants or denied without an accurate record citation in their response thereto ("Rule 7.1 Response"). (*Compare* Dkt. No. 94, Attach. 3 [Plf.'s Rule 7.1 Statement] *with* Dkt. No. 97, Attach. 1 [Fed. Defs.' Rule 7.1 Response].)

1. On February 25, 2005, when Michael O'Leary completed an application for Plaintiff's emergency or C.P.E.P. admission to Columbia Memorial Hospital, Mr. O'Leary (who possessed his DSW and ACSW) was not a psychiatrist or a physician but a social worker.[15]

2. Plaintiff was never examined by Mr. O'Leary in February 2005.[16]

---

[14] The Court notes that the term "*Rivers* Hearing" refers to a hearing pursuant to *Rivers v. Katz*, 495 N.E.2d 337 (N.Y. 1986).

[15] (Dkt. No. 80, Attach. 1, at 2 [Form for Emergency or C.P.E.P. Admission].)

[16] (Dkt. No. 94, Attach. 4, at ¶ 20 [Plf.'s Affid.].) In his affidavit, Plaintiff also swears that he did not tell Mr. O'Leary over the phone (apparently in February 2005) that he would threaten or kill any public official. (Dkt. No. 94, Attach. 4, at ¶ 20 [Plf.'s Affid.].) Granted, the record appears to establish that he did not talk to Mr. O'Leary over the phone in February 2005. (*See, e.g.,* Dkt. No. 80, Attach. 2, at 6 [Columbia Mem'l Hosp. Admission Assessment dated February 25, 2005, stating, in part, that Plaintiff "apparently has had telephone contact with Mr. O'Leary *in the past . . . .*"] [emphasis added].) However, the record also appears to establish that, on or before March 7, 2005, Plaintiff "readily admit[ted] that he had been threatening local governmental officials and would not relent in these threats *as related to Dr. Michael O'Leary*" (indicating that he had related those threats to Mr. O'Leary). (Dkt. No.

3.      On February 25, 2005, Plaintiff was picked up by law enforcement officers pursuant to Mr. O'Leary's application and was brought to Columbia Memorial Hospital.[17]

4.      On February 25, 2005, Plaintiff was subjected to examination at Columbia Memorial Hospital pursuant to N.Y. Mental Hygiene Law § 9.39.

5.      A director of any hospital identified under N.Y. Mental Hygiene Law § 9.39 "may receive and retain therein as a patient for a period of fifteen (15) days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others. . . ."[18]

6.      The director of the hospital shall admit such person for immediate observation, care, and treatment "only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of [N.Y. Mental Hygiene Law § 9.39]."[19]

7.      On February 25, 2005, Dr. Richard Tobey, a physician in the emergency room at Columbia Memorial Hospital, examined Plaintiff and completed forms entitled, "Emergency

---

80, Attach. 2, at 4 [Columbia Mem'l Hosp. Discharge Summary dated March 8, 2005].)

[17]     (Dkt. No. 80, Attach. 1, at 2 [Form for Emergency or C.P.E.P. Admission, directing peace/police officers of the Columbia County Sheriff's Department to take Plaintiff into custody and transport him to Columbia Memorial Hospital]; Dkt. No. 80, Attach. 2, at 8 [Columbia Mem'l Hosp. Report of Consultation, stating, in part, that Plaintiff had been "brought in to the ER by police on order from Dr. Michael O'Leary"].)

[18]     N.Y. Mental Hygiene Law § 9.39(a).  While the Federal Defendants argue that the above-stated paragraph does not assert a fact but a point of law to which no response is required, the Court finds that the above-stated paragraph does assert a fact under the circumstances, which include but are not limited to the nature of 18 U.S.C. § 922(g)(4)'s dependance on the N.Y. Mental Hygiene Law.  The Court renders the same finding regarding similar such paragraphs below in this Decision and Order.

[19]     N.Y. Mental Hygiene Law § 9.39(a).

Admission [Pursuant to] Section 9.39 [of the New York] Mental Hygiene Law" and "Certificate of Examining Physician to Support an Application for Involuntary Admission."

8.      Dr. Tobey also stated that, at the time of admission (which occurred at 4:15 p.m. on February 25, 2005), Plaintiff was given a copy of a document entitled, "Notice of Status and Rights [Upon] Emergency Admission . . . [Pursuant to] Section 9.39 [of the New York] Mental Hygiene Law."

9.      At 8:00 a.m. on February 26, 2005, Plaintiff requested a court hearing to be discharged from Columbia Memorial Hospital.

10.      If a person admitted according to N.Y. Mental Hygiene Law § 9.39 is to be retained in the hospital for a period of more than forty-eight hours, then (within that forty-eight hour period) "another physician who shall be a member of the psychiatric staff of the hospital" must examine the person and confirm that he or she "qualifies under the requirements of [N.Y. Mental Hygiene Law § 9.39]."[20]  In addition, the "Emergency Admission" form completed by Dr. Tobey (which is labeled as a form of the New York State Office of Mental Health) states, in pertinent part, that the aforementioned confirmation must be performed by completing [the Certificate of Examining Physician to Support an Application for Involuntary Admission]."[21]

11.      On February 25, 2005, Dr. Richard Plotkin performed an admission assessment of Plaintiff.[22]

---

[20]      N.Y. Mental Hygiene Law § 9.39(a).

[21]      (Dkt. No. 80, Attach. 2, at 14 [Emergency Admission Form].)

[22]      (Dkt. No. 80, Attach. 2, at 6-7 [Columbia Mem'l Hosp. Admission Assessment dated Feb. 25, 2005].)

14

12.     There is no admissible record evidence establishing that Dr. Plotkin completed the

form entitled, "Certificate of Examining Physician to Support an Application for Involuntary

Admission."[23]

13.     If at any time after admission according to N.Y. Mental Hygiene Law § 9.39, the

patient gives notice to the director in writing of a request for court hearing on the question of

need for immediate observation, care, and treatment, a hearing shall be held as herein provided

not more than five (5) days after such request is received (except that the commencement of such

hearing may be adjourned at the request of the patient).[24]

14.     Upon the date of such hearing, the court shall hear testimony and examine the

person alleged to be mentally ill, and shall render a decision in writing that there is reasonable

cause to believe that the patient has a mental illness for which immediate inpatient care and

treatment in a hospital is appropriate and which is likely to result in serious harm to himself or

---

[23]     (*See generally* Dkt. No. 80, Attach. 1; Dkt. No. 80, Attach. 2; Dkt. No. 94, Attach. 4-9.)  Plaintiff also asserts that there is no admissible record evidence establishing that, on February 25, 2005, Dr. Plotkin was a psychiatrist on the staff of Columbia Memorial Hospital. (Dkt. No. 94, Attach. 3, at ¶ 12 [Plf.'s Rule 7.1 Statement].)  The Federal Defendants ask the Court to take judicial notice of a page from the website of Columbia Memorial Hospital, which states that Dr. Plotkin currently specializes in psychiatry and completed his residency in psychiatry.  *See* Columbia Memorial Health https://www.columbiamemorialhealth.org/doctors/ richard-plotkin-m-d/ (last visited Jan. 12, 2017).  The Court declines to take such judicial notice, in part because of the restriction of Fed. R. Evid. 401(b)(2), and in part because the page lacks an indication that Dr. Plotkin was a psychiatrist on February 25, 2005.  However, the Court finds that a reasonable inference can be drawn from the substance of Dr. Plotkin's Admission Assessment and Discharge Summary that, on February 25, 2005, he was a psychiatrist.  (Dkt. No. 80, Attach. 2, at 3-7 [Discharge Summary and Admission Assessment].)  More important, another record expressly refers to Dr. Plotkin as a "psychiatrist." (Dkt. No. 80, Attach. 2, at 10 [Psychiatrist's Admitting Orders, indicating that the order came from "Dr. Plotklin"].)  Under the circumstance, the fact of Dr. Plotkin's status as a psychiatrist during the time in question appears undisputed in the current record.

[24]     N.Y. Mental Hygiene Law § 9.39(a).

others.[25]

15.      If the court determines there is a such reasonable cause, the court shall issue an order authorizing the retention of the person in the hospital for observation, care and/or treatment for a period not to exceed fifteen (15) days from the date of the admission. Any such order entered by the court shall not be deemed an adjudication that the patient is mentally ill, but only a determination that there is reasonable cause to retain the person for the purposes of N.Y. Mental Hygiene Law § 9.39.[26]

16.      Within fifteen (15) days of admission, if a determination is made that the person is not in need of involuntary care and treatment, he or she shall be discharged unless he or she agrees to remain as a voluntary or informal patient. If the person is in need of involuntary care and treatment and does not agree to remain as a voluntary or informal patient, he or she may be retained beyond the fifteen (15) day period only by admission to such hospital (or another appropriate hospital) pursuant to "the provisions governing involuntary admission on application supported by medical certification and subject to the provisions for notice, hearing, review, and judicial approval of retention or transfer and retention governing such admissions," i.e., N.Y. Mental Hygiene Law § 9.27.[27]

17.      There is no admissible record evidence that either Dr. Tobey or Dr. Charles Johnson was a psychiatrist on the staff of Columbia Memorial Hospital in February 2005; and, in any event, the report of consultation dated February 28, 2005, was never signed personally by Dr.

---

[25]      N.Y. Mental Hygiene Law § 9.39(a).

[26]      N.Y. Mental Hygiene Law § 9.39(a).

[27]      N.Y. Mental Hygiene Law § 9.39(b); N.Y. Mental Hygiene Law § 9.27.

Johnson but was signed by a nurse practitioner, Christine Byrnes, for Dr. Johnson.[28]

18.     On March 8, 2005, Dr. Plotkin's issued a discharge summary stating, in part, that Plaintiff was "entirely cooperative throughout the hospitalization with the exception of refusing to eat for the first week." The discharge summary also stated, in part, that "no psychotropic medications were employed during the hospitalization."[29]

19.     Dr. Plotkin's discharge summary listed Plaintiff's "Discharge Diagnosis" as, in part, "[d]elusional disorder, persecution type," and "[d]iscordant relationships with government officials."[30]

20.     In his discharge summary, Dr. Plotkin stated, in part, that "I saw no florid symptoms of psychosis otherwise nor did the patient display any PTSD. Intermittent explosive disorder may be considered as well as the patient clearly has periods of explosivity with irrational behavior at times although none of these were observed on our Psychiatric Unit."[31]

21.     Dr. Plotkin felt that he would lose a *Rivers* Hearing to force Plaintiff to take antipsychotic drugs; furthermore, on March 4, 2005, a male doctor at Columbia Memorial Hospital (possibly Dr. Plotkin) told Plaintiff that he was going to discharge Plaintiff to the Columbia County Jail before there would be a court hearing, and he suggested that Plaintiff

---

[28]     (*See generally* Dkt. No. 80, Attach. 1; Dkt. No. 80, Attach. 2; Dkt. No. 94, Attach. 4-9; *see also* Dkt. No. 80, Attach. 2, at 8-9 [Report of Consultation].)

[29]     (Dkt. No. 80, Attach. 2, at 3-5 [Discharge Summary dated March 8, 2005].)

[30]     (Dkt. No. 80, Attach. 2, at 5 [Discharge Summary dated March 8, 2005].)

[31]     (Dkt. No. 80, Attach. 2, at 5 [Discharge Summary dated March 8, 2005].)

withdraw his request for a hearing.[32]

22.     After being advised that he would be discharged, at 2:20 p.m. on March 4, 2005, Plaintiff withdrew his request for a court hearing concerning his hospitalization at Columbia Memorial Hospital.[33]

23.     On March 7, 2005, Plaintiff was discharged from Columbia Memorial Hospital.[34]

### 2.     Summary of Plaintiff's Memorandum of Law and the Federal Defendants' Opposition Memorandum of Law

Generally, Plaintiff's memorandum of law and the Federal Defendants' opposition memorandum of law assert the arguments summarized above in Parts I.B.3., and I.B.4. of this Decision and Order.

---

[32]     (Dkt. No. 80, Attach. 2, at 5 [Discharge Summary dated March 8, 2005, stating, in part, "Due to . . . my feeling that we would not prevail in a River's Petition . . ."]; Dkt. No. 94, Attach. 4, at ¶ 21 [Plf.'s Affid., stating, in part, that "On or about March 4, 2005, one of the doctors at Columbia Memorial Hospital told me that he was going to discharge me to the Columbia County Jail before there would be a court hearing, and he suggested that I should withdraw my request for a hearing."]; *cf.* Dkt. No. 80, Attach. 2, at 4 [Discharge Summary dated March 8, 2005, stating, in part, "On 3/4/05, I was able to convince the patient to accept food and drink and he stated that he had rethought his plan and that he would like to be discharged to the custody of the police to face whatever charges they have so that he can work at resolving them"].)

[33]     (Dkt. No. 94, Attach. 4, at ¶ 21 [Plf.'s Affid., stating, in part, that "I withdrew my request for a judicial hearing based on his assurance, and I was discharged"]; Dkt. No. 80, Attach. 2, at 12 [Rescission of Request for Discharge].)

[34]     (Dkt. No. 80, Attach. 2, at 3-5 [Discharge Summary dated March 8, 2005, indicating a "Discharge Date" of "03/07/05"].)

18

**D.     Briefing of State Defendants' Motion for Summary Judgment**

**1.     State Defendants' Statement of Undisputed Material Facts**

Generally, unless otherwise noted, the following facts have been found to be material by the Court, asserted and supported with accurate record citations by the State Defendants in their Statement of Material Facts ("Rule 7.1 Statement") and either expressly admitted by Plaintiff or denied without a specific supporting record citation in his response thereto ("Rule 7.1 Response").  (*Compare* Dkt. No. 81, Attach. 9 [State Defs.' Rule 7.1 Statement] *with* Dkt. No. 94, Attach. 2 [Plf.'s Rule 7.1 Response].)

<u>Involvement of Maureen Bosco and Margaret Drake</u>

1.     In or about 2009, as part of her duties as Senior Attorney in the Counsel's Office at the New York State Office of Mental Health ("OMH"), Margaret Drake typed up a list of codes to be used as a guide for OMH employees when determining if a hospital admission was an involuntary commitment under federal law that had to be reported to the National Instant Criminal Background System ("NICS").  The information concerning what New York State statutory commitment to include in the guide was relayed to her by John Tauriello, OMH Deputy Commissioner and General Counsel at the time.  She had no involvement in determining OMH policy as to what codes to include on the list, or in determining what types of hospital admissions had to be reported to NICS.  Nor did she have the authority to change the list.[35]

---

[35]     (Dkt. No. 81, Attach. 7, at ¶ 5 [Drake Decl.]; Dkt. No. 81, Attach. 8, at 2 [Ex. A to Drake Decl., attaching document entitled, "NICS Database Final"]; *cf.* Dkt. No. 94, Attach. 6, at 83, 84 [attaching pages "83" and "84" of Drake's Depo. Tr., stating that "the content [of the document entitled, 'NICS Database Final'], I was told by John Tauriello," and that subsequent to the generation of the document, John Tauriello "reviewed and approved" it]; *see also* Dkt. No. 94, Attach. 2, at ¶ 1 [Plf.'s Rule 7.1 Response, failing to provide specific record citation to Drake's 102-page deposition in support of her denial of fact asserted by the State Defendants].)

2. Maureen Bosco no longer works for OMH.

3. Ms. Bosco never set OMH policy as to what admissions get reported for inclusion in NICS.

4. Margaret Drake had no involvement in creating Plaintiff's 1996 Central New York Psychiatric Center ("CNYPC") record.

5. Ms. Drake had no involvement in determining the OMH policy pursuant to which Plaintiff's 1996 CNYPC record was sent for inclusion in NICS in 2009.[36]

6. Ms. Drake did not have the authority to alter, or direct an alteration of, Plaintiff's medical record from the CNYPC.[37]

7. Ms. Drake could not, and did not, determine if an OMH record should be removed from NICS.[38]

---

[36]     (Dkt. No. 81, Attach. 7, at ¶¶ 5, 6 [Drake Decl.]; *cf.* Dkt. No. 94, Attach. 6, at 83, 84 [attaching pages "83" and "84" of Drake's Depo. Tr.]; *see also* Dkt. No. 94, Attach. 2, at ¶ 5 [Plf.'s Rule 7.1 Response, failing to provide specific record citation to Drake's 102-page deposition in support of her denial of fact asserted by the State Defendants].)

[37]     (Dkt. No. 81, Attach. 7, at ¶¶ 5, 62 [Drake Decl.]; *cf.* Dkt. No. 94, Attach. 6, at 41-44 [attaching pages "41" through "44" of Drake's Depo. Tr., indicating that discrepancies in OMH records identified the FBI, such as incorrect dates of birth and transposed Social Security Numbers, could be corrected by OMH, but not stating that they were corrected by Ms. Drake but by John Allen]; Dkt. No. 94, Attach. 6, at 138 [Ex. 9 to Drake Depo. Tr., attaching page from 2014 Audit, stating that, on July 23, 2014, Ms. Drake had advised that she was sending a copy of the email to John Allen, who "will look into the matter and provide any necessary follow-up"]; Dkt. No. 94, Attach. 2, at ¶ 6 [Plf.'s Rule 7.1 Response, failing to provide specific record citation to Drake's 102-page deposition in support of her denial of fact asserted by the State Defendants].)

[38]     (Dkt. No. 81, Attach. 7, at ¶¶ 5, 62 [Drake Decl.]; *cf.* Dkt. No. 94, Attach. 6, at 41-44 [attaching pages "41" through "44" of Drake's Depo. Tr., indicating that she acted as an intermediator between the FBI and OMH and referred FBI inquiries about outstanding discrepancy corrections to John Allen]; Dkt. No. 94, Attach. 2, at ¶ 7 [Plf.'s Rule 7.1 Response, failing to provide specific record citation to Drake's 102-page deposition in support of her denial

8.      Ms. Drake has no legal authority to remove Plaintiff's 1996 OMH record from NICS.[39]

9.      Maureen Bosco had no involvement in creating Plaintiff's 1996 CNYPC record.

10.     Ms. Bosco had no involvement in deciding to send Plaintiff's 1996 CNYPC record for inclusion in NICS in 2009.

11.     Ms. Bosco had no authority to change Plaintiff's 1996 medical records or the report that was made to OMH regarding him.

12.     Ms. Bosco could not, and did not, determine if an OMH record should be included in, or removed from, NICS.[40]

13.     Ms. Bosco has no authority to remove Plaintiff's 1996 OMH record from NICS.

14.     The Executive Director of CNYPC cannot, and does not, determine if an OMH record should be included in, or removed from, NICS.

15.     In 2013, as Executive Director of CNYPC, Maureen Bosco received a message from a member of her staff that Plaintiff had called the CNYPC seeking his records.

16.     Ms. Bosco called Plaintiff who informed her that he had requested his records and that he had been denied the ability to purchase a gun based on information that he thought Ms. Bosco had provided to the FBI.

---

of fact asserted by the State Defendants].)

[39]     (Dkt. No. 81, Attach. 7, at ¶¶ 5, 62 [Drake Decl.]; *cf.* Dkt. No. 94, Attach. 6, at 41-44 [attaching pages "41" through "44" of Drake's Depo. Tr.]; Dkt. No. 94, Attach. 2, at ¶ 8 [Plf.'s Rule 7.1 Response, failing to provide specific record citation to Drake's 102-page deposition in support of her denial of fact asserted by the State Defendants].)

[40]     (Dkt. No. 81, Attach. 5, at ¶¶ 15, 22 [Bosco Decl.]; Dkt. No. 94, Attach. 2, at ¶ 12 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants].)

17.     However, Ms. Bosco had never provided any information about Plaintiff, or anyone else, to the FBI.

18.     During that telephone call, Plaintiff asked Ms. Bosco to put in writing that Plaintiff had never been committed to the CNYPC.

19.     Ms. Bosco told Plaintiff that she could not do so if he had, in fact, been involuntarily admitted to the CNYPC.

20.     The telephone call lasted ten minutes or less.

21.     Based on her review of Plaintiff's CNYPC records, Ms. Bosco sent Plaintiff a letter dated July 12, 2013.[41]

22.     Ms. Bosco had no further involvement with Plaintiff.[42]

23.     During several telephone conversations with Plaintiff over a couple of months, Margaret Drake told him that his admission to the CNYPC in 1996 was an involuntary

---

[41]     (Dkt. No. 81, Attach. 5, at ¶¶ 19-20 [Bosco Decl.]; Dkt. No. 94, Attach. 2, at ¶ 21 [Plf.'s Rule 7.1 Response, expressly admitting fact asserted by State Defendants, and stating an additional fact that is non-responsive to the State Defendants' fact and in any event is unsupported by a specific record cite].)  *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'"); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of arguably implied facts that are not expressly asserted) (Suddaby, J.).

[42]     (Dkt. No. 81, Attach. 5, at ¶ 21 [Bosco Decl.]; Dkt. No. 94, Attach. 2, at ¶ 22 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants].)

commitment.[43]

24.    Also during these telephone conversations, Ms. Drake told Plaintiff that he could use the certificate-of-relief process and how to use it.[44]

25.    In fact, in March 2013 and again on May 17, 2013, Ms. Drake sent a letter to Plaintiff enclosing the application for a certificate of relief with instructions on what documentation must accompany the application.

26.    In May 2013, OMH received an application for a certificate of relief from Plaintiff without the required accompanying documentation.

27.    Ms. Drake then sent a letter to Plaintiff dated May 31, 2013, informing him that his application was incomplete and identifying the information that he needed to submit.

28.    Plaintiff never provided the required information and, therefore, never completed the application process.

29.    In response to a letter from Plaintiff's attorney, Ms. Drake sent the attorney a letter dated September 6, 2013, explaining why (she believed that) Plaintiff's 1996 admission to the CNYPC was an involuntary commitment for purposes of 18 U.S.C. § 922(g)(4), and again

---

[43]    (Dkt. No. 81, Attach. 7, at ¶ 55 [Drake Decl.]; Dkt. No. 94, Attach. 2, at ¶ 23 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants, then denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[44]    (Dkt. No. 81, Attach. 7, at ¶ 56 [Drake Decl.]; Dkt. No. 94, Attach. 2, at ¶ 24 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants, then denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

telling him that he could use certificate-of-relief process.[45]

<u>Plaintiff's 1996 Admission to CNYPC</u>

30.     On July 22, 1996, Plaintiff was placed into the Columbia County Jail and held on charges of assault in the second degree, harassment and resisting arrest for allegedly "kicking the sheriff."[46]

31.     As of August 30, 1996, Plaintiff had not ingested any food or fluids for eight or nine days.[47]

32.     Dr. M. Thambirajah, M.D., a physician duly designated by the Columbia County Director of Community Services, examined Plaintiff and submitted an application to the CNYPC, together with a Certification of Examination dated August 30, 1996, asking the CNYPC to admit Plaintiff because Dr. Thambirajah's examination of Plaintiff led to Dr. Thambirajah's opinion that Plaintiff has a mental illness that is likely to result in serious harm to himself or others as manifested by threats of or attempts at suicide or serious bodily harm or

---

[45]     (Dkt. No. 81, Attach. 7, at ¶ 61 [Drake Decl.]; Dkt. No. 94, Attach. 2, at ¶ 30 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants, then denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[46]     (Dkt. No. 81, Attach. 82, at 52 [attaching page 50 of Ex. A to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 31 [Plf.'s Rule 7.1 Response, expressly admitting fact asserted by State Defendants, and stating an additional fact that is non-responsive to the State Defendants' fact and in any event is unsupported by a specific record cite].)

[47]     (Dkt. No. 82, at 8 [attaching page "6" of Ex. A to Kerwin Affid.]; Dkt. No. 94, Attach. 4, at ¶¶ 16-17 [Phelps Affid.]; Dkt. No. 94, Attach. 9, at 25 [attaching page "25" of Phelps Depo. Tr.].)

other conduct demonstrating that he is dangerous to himself.[48]

33.     On a CNYPC Screening/Admission Note and Psychiatric Evaluation dated August 30, 1996, non-psychiatric staff physician Norma S. Carillo, M.D., stated that Plaintiff was "delusional."[49]

34.     Dr. Carillo also stated that Plaintiff appeared to be "expressing delusion + paranoia."[50]

35.     On a CNYPC Inpatient / Outpatient Nursing Assessment dated August 30, 1996, a nurse listed Plaintiff's "Problem List" as including "? [sic] poor impulse control (assaulting a CO)."[51]

36.     After arriving at the CNYPC at approximately 4:00 p.m., Plaintiff was examined by Dr. Carillo.

37.     At 5:00 p.m. on August 30, 1996, Dr. Carillo signed the application confirming Dr. Thambirajah's opinion that Plaintiff had a mental illness that is likely to result in serious harm to himself or others as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself.

---

[48]     (Dkt. No. 82, at 70-73 [Ex. B. to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 33 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants, then denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[49]     (Dkt. No. 82, at 11 [attaching page "9" of Ex. A to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 34 [Plf.'s Rule 7.1 Response, failing to support denial with a specific record cite].)

[50]     (Dkt. No. 82, at 12 [attaching page "10" of Ex. A to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 35 [Plf.'s Rule 7.1 Response, failing to support denial with a specific record cite].)

[51]     (Dkt. No. 82, at 14 [attaching page "12" of Ex. A to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 36 [Plf.'s Rule 7.1 Response, failing to support denial with a specific record cite].)

38.     Plaintiff was then admitted to the CNYPC.[52]

49.     Upon admission, Plaintiff was provided, and signed, a document that notified him of, in part, (1) his admission to the CNYPC pursuant to N.Y. Correction Law § 402, (2) his right to freely communicate with, and be assisted by a representative, of the New York Mental Hygiene Legal Service ("MHLS"), and (3) the fact that, if he desired a court hearing on the question of his hospitalization, he was to talk to the MHLS.[53]

40.     Patients admitted to the CNYPC pursuant to N.Y. Mental Hygiene Law § 9.37 (and N.Y. Corr. Law § 508), as was Plaintiff on August 30, 1996, have been (at least initially) found to be in need of not merely observation and evaluation but immediate mental-illness care and treatment.[54]

41.     On September 4, 1996, a clinician documented that Plaintiff was "free of overt delusional persecutory trends except for his insistent claims of conflict of interest and suspicion of corruption towards Sheriff . . . ."[55]

---

[52]     (Dkt. No. 82, at 3-68 [Ex. A. to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 38 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants, then denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[53]     (Dkt. No. 82, at 68 [attaching page "66" of Ex. A. to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 38 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants, then denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[54]     N.Y. Corr. Law § 508; N.Y. Mental Hygiene Law § 9.37.  (*See also* Dkt. No. 81, Attach. 5, at ¶¶ 23, 29 [Bosco Decl.].)

[55]     (Dkt. No. 82, at 48-49 [attaching pages "46" and "47" of Ex. A to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 42 [Plf.'s Rule 7.1 Response, failing to specifically deny facts asserted by the State Defendants, or support any denial with a specific record cite].)

42.	At approximately 4:00 p.m. on September 4, 1996, Plaintiff was discharged from the CNYPC back to the Columbia County Jail.

43.	Plaintiff's diagnosis at discharge was as follows: an Axis I diagnosis of Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Acute; no Axis II diagnosis, but Obsessive-Compulsive and Paranoid Traits; and an Axis IV diagnosis of severe, predominately acute Psychosocial Stressors.[56]

Plaintiff's 2005 Admission to Columbia Memorial Hospital

44.	On February 25, 2005, Columbia County law enforcement officials were ordered by Columbia County Mental Health official Michael G. O'Leary to take Plaintiff into custody and transport him to Columbia Memorial Hospital pursuant to N.Y. Mental Hygiene Law § 9.45.[57]

45.	According to a Columbia Memorial Hospital Discharge Summary prepared by Richard Plotkin, M.D., such order was placed by Mr. O'Leary, because (according to Mr. O'Leary) Plaintiff "had begun threatening public officials and had reportedly stated he had intentions of killing them this week."[58]

---

[56]	(Dkt. No. 82, at 53 [attaching page "51" of Ex. A. to Kerwin Affid.]; Dkt. No. 94, Attach. 2, at ¶ 44 [Plf.'s Rule 7.1 Response, admitting fact asserted by State Defendants, then denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[57]	(Dkt. No. 23, Attach. 1, at 20 [attaching Columbia County Transport Report]; Dkt. No. 94, Attach. 2, at ¶ 45 [Plf.'s Rule 7.1 Response, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[58]	(Dkt. No. 80, Attach. 2, at 3 [attaching page "1" of Discharge Summary dated March 8, 2005]; Dkt. No. 94, Attach. 2, at ¶ 46 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

46.     The information provided by Mr. O'Leary to Columbia Memorial Hospital included as assertion that Plaintiff "had telephone contact with Mr. O'Leary in the past but recently as late as this week has become increasingly agitated and has begun making significant detailed threats toward public officials. It was felt by Michael O'Leary and the patient's wife that they were concerned he would actually act upon these threats . . . ."[59]

47.     On February 25, 2005, Plaintiff was admitted to Columbia Memorial Hospital on an emergency admission pursuant to N.Y. Mental Hygiene Law § 9.39, by Columbia Memorial Hospital Emergency Room physician Dr. Richard Tobey, following his examination of Plaintiff.[60]

48.     Upon admission on February 25, 2005, Plaintiff was examined by Nurse Practitioner Sara Heimroth on behalf of Dr. Plotkin.[61]

49.     Upon examination, Ms. Heimroth's assessment of Plaintiff's mental status was as follows:

> Reveals a 56 year old married Caucasian male who presents with extremely poor ADL's, quite disheveled and covered in mud secondary to

---

[59]     (Dkt. No. 80, Attach. 2, at 3 [attaching page "1" of Discharge Summary dated March 8, 2005]; Dkt. No. 94, Attach. 2, at ¶ 46 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[60]     (Dkt. No. 80, Attach. 2, at 14-15 [Emergency Admission and Certificate of Examining Physician]; Dkt. No. 94, Attach. 2, at ¶ 48 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying facts not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[61]     (Dkt. No. 80, Attach. 2, at 6-7 [Admission Assessment]; Dkt. No. 94, Attach. 2, at ¶ 49 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

being restrained by the police after he became assaultive towards them. He is uncooperative with the interview. Eye contact is poor. Speech is low. Thought processes appear to be somewhat disorganized and illogical. He currently denies suicidal or homicidal ideation stating "I will not talk," however today had made homicidal statements towards several county and state officials. Long-term, short-term and immediate memory appear to be intact. Judgment and insight are extremely poor. Impulse control is currently poor as he was medicated in the ER for increased agitation.[62]

50.     In his Admission Assessment, Plaintiff's Axis I diagnosis was as follows:

Psychotic Disorder, NOS; PTSD; and Intermittent Explosive Disorder. His Axis IV diagnosis

was Psychosis.[63]

51.     On February 25, 2005, Plaintiff received and signed a notice of his right to a court

hearing to challenge his hospitalization.[64]

52.     On February 26, 2005, Plaintiff requested a court hearing to be discharged from

Columbia Memorial Hospital.[65]

---

[62]     (Dkt. No. 80, Attach. 2, at 6 [attaching page "1" of Admission Assessment]; Dkt. No. 94, Attach. 2, at ¶ 50 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[63]     (Dkt. No. 80, Attach. 2, at 7 [attaching page "2" of Admission Assessment]; Dkt. No. 94, Attach. 2, at ¶ 51 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying facts not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[64]     (Dtk. No. 80, Attach. 2, at 13 [Notice of Status and Rights / Emergency Admission]; Dkt. No. 94, Attach. 2, at ¶ 52 [Plf.'s Rule 7.1 Response, failing to specifically deny fact asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[65]     (Dtk. No. 80, Attach. 2, at 12 [Request for Court Hearing]; Dkt. No. 94, Attach. 2, at ¶ 53 [Plf.'s Rule 7.1 Response, failing to specifically deny fact asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

53.     On March 4, 2005, he rescinded that request.[66]

54.     Plaintiff received care and treatment while hospitalized at Columbia Memorial

Hospital.[67]

55.     On March 7, 2005, Plaintiff was discharged from Columbia Memorial Hospital to

the custody of the Columbia County Sheriff, with the following diagnosis: an Axis I diagnosis of

Delusional Disorder, persecutory type; and an Axis IV diagnosis of Discordant relationships with

government officials.[68]

### OMH Response to NICS Improvement Amendments Act of 2007

56.     In response to NICS Improvement Amendments Act of 2007, N.Y. Mental

Hygiene Law § 7.09 was amended in 2008.[69]

57.     These amendments required OMH to transmit to the federal NICS database

information identifying individuals who have been involuntarily committed to a hospital in New

---

[66]     (Dtk. No. 80, Attach. 2, at 12 [Request for Court Hearing]; Dkt. No. 94, Attach. 2, at ¶ 54 [Plf.'s Rule 7.1 Response, failing to specifically deny fact asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[67]     (Dkt. No. 80, Attach. 2, at 4 [Discharge Summary, stating, in part, "During the course of the patient's hospitalization, he did engage seemingly productively in individual and group psychotherapy.  He was able to see that the methods he had employed over the years with regards to dispute resolution with governmental officials was inappropriate and caused more problems than they solve."]; Dkt. No. 94, Attach. 2, at ¶ 55 [Plf.'s Rule 7.1 Response, failing to specifically deny fact asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[68]     (Dtk. No. 80, Attach. 2, at 5 [Discharge Summary]; Dkt. No. 94, Attach. 2, at ¶ 56 [Plf.'s Rule 7.1 Response, failing to specifically deny fact asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[69]     (Dkt. No. 81, Attach. 3, at ¶ 10 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 57 [Plf.'s Rule 7.1 Response, failing to specifically deny fact asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

York State.[70]

58.    OMH utilized a part of its existing data system in an attempt to identify

involuntary commitments to state hospitals that had to be reported for inclusion in NICS.[71]

59.    Although the systems have changed over time, OMH has always used its existing

electronic medical records system to generate the records that need to be sent to the New York

State Division of Criminal Justice Services, ("DCJS") for inclusion in NICS (typically supported

by data in the paper records for each patient).[72]

60.    Data is entered into the electronic medical records by hospital employees at the

time of patients' hospitalizations. The legal status of a patient is assessed by his or her admitting

physician and is entered by hospital staff at or about the time of the patient's admission, or

change in status.[73]

61.    OMH's data system has an element that attempts to assess an individual's "legal

status" at the time of admission to a facility.[74]

---

[70]    (Dkt. No. 81, Attach. 3, at ¶ 10 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 58 [Plf.'s Rule 7.1 Response, admitting fact].)

[71]    (Dkt. No. 81, Attach. 3, at ¶ 11 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 59 [Plf.'s Rule 7.1 Response, admitting fact].)

[72]    (Dkt. No. 81, Attach. 3, at 3, n.1 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 59 [Plf.'s Rule 7.1 Response, failing to support denial with a specific record citation].)

[73]    (Dkt. No. 81, Attach. 3, at 3, n.1 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 61 [Plf.'s Rule 7.1 Response, expressly admitting fact, and in any event failing to support any denial with a specific record citation].)

[74]    (Dkt. No. 81, Attach. 3, at ¶ 11 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 62 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying facts not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

62. The program gathers records relating to assessed involuntary commitments nightly, which are put into an electronic file, encrypted and then transmitted to the DCJS, which then transmits the records to the Criminal Justice Information Services Division of the FBI for inclusion in the NICS database.[75]

63. OMH began sending such involuntary commitment records to NICS in 2009, and the records of Plaintiff's 1996 admission to the CNYPC was transmitted to DCJS in 2009 as part of OMH's initial reporting of involuntary commitment information maintained by OMH from 1989 forward.[76]

64. In 2009, pursuant to N.Y. Mental Hygiene Law § 7.09, New York State implemented a process for those who seek such a certificate of relief from disabilities.[77]

65. The application form for a certificate of relief from disabilities related to firearms, and further information regarding the process, are available on the website for the Office of NICS Appeals and New York State Secure Ammunition and Firearms Enforcement Act ("Safe Act").[78]

---

[75] (Dkt. No. 81, Attach. 3, at ¶ 11 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 63 [Plf.'s Rule 7.1 Response, failing to specifically deny fact asserted by the State Defendants, denying facts not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[76] (Dkt. No. 81, Attach. 3, at ¶¶ 14, 28 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 64 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying facts not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[77] (Dkt. No. 81, Attach. 3, at ¶ 17 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 65 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[78] (Dkt. No. 81, Attach. 3, at ¶ 18 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 66 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not

66.     Once an application is submitted, a written explanation is provided explaining the reason for the decision.[79]

67.     The scope of the review includes a comprehensive psycho-social and clinical determination, on an individual basis, as to whether or not the applicant will not be likely to act in a manner dangerous to himself or herself or public safety and granting the relief will not be contrary to the public interest.[80]

68.     If the application is denied, a review is available pursuant to Article 78 of the New York Civil Practice Law and Rules.[81]

69.     In 2013, Plaintiff "might have considered purchasing a gun" if he had not been on the "disqualified list"; however, as of December 6, 2013, Plaintiff wanted a rifle or shotgun in order to hunt deer and other game animals; and, as of December 12, 2016, he wanted to purchase

---

asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[79]     (Dkt. No. 81, Attach. 3, at ¶ 21 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 67 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[80]     (Dkt. No. 81, Attach. 3, at ¶ 21 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 68 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

[81]     (Dkt. No. 81, Attach. 3, at ¶ 21 [Allen Decl.]; Dkt. No. 94, Attach. 2, at ¶ 69 [Plf.'s Rule 7.1 Response, admitting fact asserted by the State Defendants, denying fact not asserted by the State Defendants, and in any event failing to support denial with a specific record citation].)

a rifle because he would like to enjoy hunting again.[82]

## 2.    Summary of State Defendants' Memorandum of Law

Generally, in their memorandum of law, the State Defendants assert five arguments: (1) Plaintiff lacks standing to assert a claim that the State Defendants erroneously reported his 1996 admission to the CNYPC under N.Y. Mental Hygiene Law § 9.37 as a disqualifying "commitment to a mental institution" under 18 U.S.C. § 922(g)(4), because he has another "commitment to a mental institution" which he has not challenged and which prohibits him from legally purchasing or possessing a firearm (i.e., his 2005 admission to Columbia Memorial Hospital under N.Y. Mental Hygiene Law § 9.39); (2) because neither Defendant Drake nor Defendant Bosco were personally involved in the alleged violation of federal law (and Ms. Bosco no longer works at the CNYPC or for OMH, and Ms. Drake does not have the authority to either alter Plaintiff's CNYPC record or order the removal of his records from the NICS database), neither can implement the injunctive relief sought in the Complaint; (3) Plaintiff's claims fail because his 1996 admission to the CNYPC under N.Y. Mental Hygiene Law § 9.37 constituted a disqualifying "commitment to a mental institution" under 18 U.S.C. § 922(g)(4), pursuant to the rule set forth in *United States v. Waters*, 23 F.3d 29 (2d Cir. 1994) (which found a disqualifying commitment occurred upon an admission pursuant to N.Y. Mental Hygiene Law § 9.27, the standard for which is less stringent than is the standard for an admission pursuant to N.Y. Mental Hygiene Law § 9.37); (4) Plaintiff fails to establish a claim against the State Defendants under 42 U.S.C. § 1983 because he has not established (a) that a violation of his Second Amendment

---

[82]      (Dkt. No. 1, at ¶ 23 [Plf.'s Compl.]; Dkt. No. 81, Attach. 2, at 22-24 [attaching pages "21" through "23" of Plf.'s Depo. Tr.]; Dkt. No. 94, Attach. 4, at ¶ 24 [Phelps Affid.].)

rights occurred (given that, *inter alia*, Plaintiff wants the firearms merely for hunting purposes), (b) that any action by the State Defendants caused him injury (given Plaintiff's commitment to Columbia Memorial Hospital in 2005 pursuant to N.Y. Mental Hygiene Law § 9.39), or (c) that the State Defendants were personally involved in the alleged illegal conduct of which he complains; and (5) even if the Court finds that disputes of material fact exist as to whether the State Defendants violated Plaintiff's Second Amendment rights, Defendants Drake and Bosco are protected from liability as a matter of law on Plaintiff's claims for monetary damages pursuant to the doctrine of qualified immunity, because it was objectively reasonable for them to believe that their acts did not violate any rights of Plaintiff that were clearly established in 2013. (Dkt. No. 81, Attach. 10 [State Defs.' Memo. of Law].)

### 3. Summary of Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff asserts five arguments: (1) the Court should not enter judgment for the State Defendants on Plaintiff's first claim, because (a) in its Decision and Order of March 26, 2015, the Court correctly held that Plaintiff's 1996 admission to the CNYPC pursuant to N.Y. Mental Hygiene Law § 9.37 was not a "commitment" within the meaning of 18 U.S.C. § 922(g)(4), and (b) Plaintiff's 2005 admission to Columbia Memorial Hospital pursuant to N.Y. Mental Hygiene Law § 9.39 was for observation and evaluation only and thus did not constitute a "commitment" within the meaning of 18 U.S.C. § 922(g)(4); (2) Defendant Drake was personally involved in denying Plaintiff's appeal from the denial of his application to purchase a firearm by sending her letter of September 6, 2013, or at the very least a genuine dispute of material fact exists regarding her personal involvement in the wrongful conduct alleged in Plaintiff's third claim; (3) the State Defendants' standing arguments

are frivolous because (a) OMH never reported Plaintiff's 2005 admission to Columbia Memorial Hospital to the NICS database (and, in any event, 18 U.S.C. § 925A is broadly worded to give Plaintiff standing to challenge merely the providing of erroneous information by OMH to the NICS database), and (b) the State Defendants' argument that Plaintiff wishes to pursue a long gun to go hunting, rather than to shoot intruders in his home, is without merit (given that the founding fathers also used long guns to go hunting); (4) Defendant Drake is not entitled to qualified immunity as a matter of law because both 27 C.F.R. § 478.11 and the Second Circuit's decision in *United States v. Waters* clearly established that a temporary admission to a mental hospital for observation purposes only is not a "commitment" under 18 U.S.C. § 922(g)(4); and (5) the Attorney General's Office has a conflict of interest in representing both the New York State OMH and Defendant Drake in this action. (Dkt. No. 94, Attach. 10 [Plf.'s Opp'n Memo. of Law].)

In addition, in an affirmation, Plaintiff's counsel states that Plaintiff withdraws that portion of Plaintiff's second claim which is asserted against Defendant Bosco. (Dkt. No. 94, Attach. 1, at ¶ 5 [Oliver Affirm.].)

### 4.      Summary of State Defendants Reply Memorandum of Law

Generally, in their reply memorandum of law, the State Defendants assert seven arguments: (1) to the extent that Plaintiff's Rule 7.1 Statement and Rule 7.1 Response fail to specifically cite to admissible record evidence, both his motion and his opposition to the State Defendants' motion are defective and should be denied; (2) Plaintiff's reliance on the law-of-the-case doctrine is misplaced (a) because the Court's Decision and Order of March 26, 2015 (which merely partially denied the State Defendants' motion to dismiss for failure to state a claim), does

36

not preclude the entry of summary judgment for the State Defendants, and (b) in any event, the application of the doctrine is discretionary; (3) Plaintiff lacks standing to bring this challenge to his 1996 commitment to the CNYPC because (a) his 2005 commitment to Columbia Memorial Hospital provides an independent disqualifying event under 18 U.S.C. § 922(g)(4), (b) by its plain language, 18 U.S.C. § 922(g)(4) does not require that a commitment be reported to NICS in order to disqualify one from legally possessing a firearm, (c) the State Defendants are not required to assert this defense in their Answer, and (d) in any event, Plaintiff has failed to pursue a certificate of relief from disabilities; (4) N.Y. Mental Hygiene Law § 9.37 is a qualifying commitment statute under 18 U.S.C. § 922(g)(4) and serves the purposes of that statute while comporting with due process, because (a) a court hearing is not required before an involuntary commitment, and (b) N.Y. Mental Hygiene Law § 9.37 does not provide for admission for observation only; (5) Plaintiff mischaracterizes the medical records and statutory language in an attempt to advance his unsupported and conclusory assertion that he was admitted merely for observation and not committed in 1996 and 2005, because (a) the uncontested evidence establishes that Plaintiff was involuntarily committed to the CNYPC in 1996 pursuant to N.Y. Mental Hygiene Law § 9.37 and not admitted for observation (given that he had been examined by two physicians–Dr. Thambirajah and Dr. Carillo), (b) the uncontested evidence establishes that Plaintiff was involuntarily committed to Columbia Memorial Hospital in 2005 pursuant to N.Y. Mental Hygiene Law § 9.39, and (c) the Court's Decision and Order of March 26, 2015, does not preclude the determination here that, based on the admissible record evidence, Plaintiff's 1996 commitment constituted an involuntary commitment; (6) Plaintiff's claims against Defendant Drake in both her official and individual capacities are subject to dismissal,

because (a) Plaintiff has not established that Defendant Drake violated his rights under the Second Amendment, (b) Defendant Drake was neither personally involved in any alleged constitutional violation nor the proximate cause of any of Plaintiff's injuries, and (c) Defendant Drake's inability to remedy Plaintiff's alleged injury is fatal to his claim; and (7) in any event, Defendant Drake is entitled to qualified immunity, because Plaintiff points to no binding precedent clearly establishing that reporting emergency admissions pursuant to N.Y. Mental Hygiene Law § 9.37 to NICS is unlawful (or that a reasonable state official in Defendant Drake's position would have reasonably understood that she had a duty, even where she lacked authority, to remove a true and accurate OMH record from NICS). (Dkt. No. 98, Attach. 3 [State Defs.' Reply Memo. of Law].)

### E. Briefing of Plaintiff's Cross-Motion for Summary Judgment Against State Defendants

#### 1. Plaintiff's Statement of Undisputed Material Facts (Regarding State Defendants)

Generally, unless otherwise noted, the following facts have been found to be material by the Court, asserted and supported with accurate record citations by Plaintiff in his Statement of Material Facts ("Rule 7.1 Statement") and either expressly admitted by the State Defendants or denied without an accurate record citation in their response thereto ("Rule 7.1 Response"). (*Compare* Dkt. No. 94, Attach. 2 [Plf.'s Rule 7.1 Statement] *with* Dkt. No. 98, Attach. 2 [State Defs.' Rule 7.1 Response].)

<u>2005 Admission for Observation</u>

The first thirty paragraphs of Plaintiff's Rule 7.1 Statement against the State Defendants (which regard his 2005 admission to Columbia Memorial Hospital) are identical to the first thirty

paragraphs of his Rule 7.1 Statement against the Federal Defendants. Moreover, the effect of the State Defendants' denials of those facts is the same as the effect of the Federal Defendants' denials of those facts (especially given the lack of admissible record evidence specifically cited by Plaintiff). As a result, the Court incorporates by reference the first twenty-three paragraphs contained above in Part I.C.1. of this Decision and Order.

1999 Admission for Observation

24.     Under N.Y. Mental Hygiene Law § 9.37 (which is entitled, "Involuntary admission on certificate of a director of community services or his designee"), the director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in that hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.[83]

25.     The aforementioned application shall be based upon a personal examination by a director of community services or his designee, shall be in writing, and shall be filed with the director of such hospital at the time of the patient's reception, together with a statement on a form prescribed by the commissioner of OMH giving such information as he may deem

---

[83]     N.Y. Mental Hygiene Law § 9.37(a). While the Federal Defendants argue that the above-stated paragraph does not assert a fact but a point of law to which no response is required, the Court finds that the above-stated paragraph does assert a fact under the circumstances, which include but are not limited to the nature of 18 U.S.C. § 922(g)(4)'s dependance on the New York Mental Hygiene Law. The Court renders the same finding regarding similar such paragraphs below in this Decision and Order.

appropriate.[84]

26.     The need for immediate hospitalization shall be confirmed by a staff physician of the hospital before admission.[85]

27.     Within seventy-two (72) hours, excluding Sunday and holidays, after such admission under N.Y. Mental Hygiene Law § 9.37, if such patient is to be retained for care and treatment beyond such time and he or she does not agree to remain in the hospital as a voluntary patient, the certificate of another examining physician–who is a member of the psychiatric staff of the hospital–that the patient is in need of involuntary care and treatment shall be filed with the hospital.[86]

28.     As a result, if a decision is made to retain the patient for care and treatment in the hospital involuntarily beyond seventy-two (72) hours under N.Y. Mental Hygiene Law § 9.37(a), then a physician who is a member of the psychiatric staff of the hospital must file a certificate with the hospital claiming that the patient is in need of involuntary care and treatment.[87]

29.     From the time of the patient's admission to the hospital, the retention of the patient for care and treatment shall be subject to the provisions of notice, hearing, review, and judicial approval of continued retention or transfer and continued retention provided by N.Y.

---

[84]     N.Y. Mental Hygiene Law § 9.37(b).

[85]     N.Y. Mental Hygiene Law § 9.37(a).

[86]     N.Y. Mental Hygiene Law § 9.37(a).  (*See also* Dkt. No. 98, Attach. 1, at ¶ 8 [Drake Suppl. Decl.].)

[87]     (Dkt. No. 81, Attach. 7, at ¶ 16 [Drake Decl.].)

Mental Hygiene Law § 9.37 for the admission and retention of involuntary patients.[88]

30.     On Friday, August 30, 1996, when Plaintiff arrived at the CNYPC pursuant to

N.Y. Mental Hygiene Law § 9.37, he was evaluated, screened and admitted by Dr. Norma L.

Carillo, M.D., who was not a psychiatrist.[89]

31.      On August 30, 1996, after Plaintiff was admitted to the CNYPC pursuant to N.Y.

Mental Hygiene Law § 9.37, he saw only one psychiatrist, Dr. Karl Newton.[90]

32.     On September 3 and 4, 1996, Dr. Newton examined Plaintiff.[91]

33.     In a report dated September 4, 1996, Dr. Newton stated as follows, in part:

> [Plaintiff] was completely cooperative to admission procedures, ward
> routines and special observation, exhibiting consistently amiable
> demeanor. . . . There was no indication of delusional thinking with
> reference to his current surroundings.  Admitting doctor diagnosed him as
> Depressive Disorder NOS.  He has been . . . by this writer . . . found free
> of obvious delusions and reasonable in his outlook and his plans.
>
> [He] shows a calm, accepting demeanor with firm but not fixed beliefs and
> with no clear delusional content. . . . [H]e seems quite willing and
> intending to have his day by legal, civil means.  There is no psychosis or
> mood disorder found in this setting.  He does not appear to be a danger to

---

[88]     N.Y. Mental Hygiene Law § 9.37(a).

[89]     (Dkt. No. 82, at 4 [Admission/Screening Form]; Dkt. No. 82, at 9-12 [Screening /
Admission Note and Psychiatric Evaluation]; Dkt. No. 94, Attach. 6, at 85-86 [attaching pages
"85" and "86" of Drake Depo. Tr.]; Dkt. No. 94, Attach. 8, at 99 [attaching page "99" of Allen
Depo. Tr.]; Dkt. No. 81, Attach. 7, at ¶¶ 46-48 [Drake Decl.].)

[90]     (Dkt. No. 82, at 6 [Diagnosis Record]; Dkt. No. 82, at 52-54 [Ex. A to Kerwin
Affid., attaching Discharge Summary dated Sept. 4, 1996]; Dkt. No. 94, Attach. 6, at 86
[attaching page "86" of Drake Depo. Tr.]; Dkt. No. 94, Attach. 8, at 98-100, 104-05 [attaching
pages "98," "99," "100," "104," and "105" of Allen Depo. Tr.]; Dkt. No. 94, Attach. 5, at 26
[attaching page "26" of Bosco Depo. Tr.]; Dkt. No. 98, Attach. 1, at ¶ 6 [Drake Suppl. Decl.].)

[91]     (Dkt. No. 82, at 53 [Ex. A to Kerwin Affid., attaching Discharge Summary dated
Sept. 4, 1996].)

himself or others.[92]

34.     On Wednesday, September 4, 1996, within seventy-two (72) hours after Plaintiff's admission to the CNYPC, Dr. Newton discharged Plaintiff.[93]

OMH's Inclusion of Plaintiff in Its 2009 Notification to NICS of
Persons Prohibiting from Purchasing a Firearm

35.     It is the policy of OMH that all admissions to a mental hospital pursuant to N.Y. Mental Hygiene Law § 9.37, whether resulting in a discharge from the hospital in less than seventy-two (72) hours and not involving the actual receipt of treatment at the mental hospital, are a "commit[ment] to a mental institution" for purposes of 18 U.S.C. § 922(g)(4).[94]

36.     It is the understanding of Defendant Drake and John B. Allen, Jr., that all admissions to a mental hospital pursuant to N.Y. Mental Hygiene Law § 9.39 are a "commit[ment] to a mental institution" for purposes of 18 U.S.C. § 922(g)(4).[95]

37.     Although its systems have changed over time, OMH has always used its existing electronic medical records system to generate the records that need to be sent to DCJS for inclusion in NICS (typically supported by data in the paper records for each patient). Data is entered into the electronic medical records by hospital employees at the time of patients'

---

[92]     (Dkt. No. 82, at 53 [Ex. A to Kerwin Affid., attaching Discharge Summary dated Sept. 4, 1996].)

[93]     (Dkt. No. 82, at 52-54 [Ex. A to Kerwin Affid., attaching Discharge Summary dated Sept. 4, 1996].)

[94]     (Dkt. No. 94, Attach. 6, at 61-64 [attaching pages "61" through "64" of Drake Depo. Tr.]; Dkt. No. 81, Attach. 5, at ¶ 11 [Drake Decl.].)

[95]     (Dkt. No. 81, Attach. 7, at ¶ 66 [Drake Decl.]; Dkt. No. 81, Attach. 3, at ¶ 12 [Allen Decl.]; Dkt. No. 98, Attach. 1, at ¶ 19 [Drake Supp. Decl.].)

hospitalizations. The legal status of a patient is determined by his or her admitting physician and is entered by hospital staff at or about the time of the patient's admission, or change in status.[96]

39. In response to the NICS Improvement Amendments Act of 2007, OMH determined that any admissions to a hospital made pursuant to the following statutes had the legal status of a "commit[ment] or adjudicat[ion] as a mental defective," as defined by federal law, and, therefore, had to be reported to NICS under federal law: N.Y. Mental Hygiene Law § 9.27, § 9.33, § 9.37, § 9.39 & Article 10; N.Y. Crim. Proc. Law § 730 Temporary Order of Observation, Order of Commitment and Order of Retention Civil, and § 330.20 Commitment, Order of Retention, Recommitment, Transfer Order, Temporary Confinement Order; and Correction Law § 402 and § 508.[97]

39. In or about 2009, Ms. Drake was assigned the task of typing up a list of codes to be used as a guide for OMH employees when determining if a hospital admission was an involuntary commitment under federal law that had to be reported to NICS.[98]

40. The information concerning what statutory commitments to include in the guide was related to Ms. Drake by John Tauriello (who was OMH Deputy Commissioner and General Counsel at the time).[99]

---

[96] (Dkt. No. 81, Attach. 3, at 3, n.1 [Allen Decl.].)

[97] (Dkt. No. 81, Attach. 3, at ¶ 12 [Allen Decl.].)

[98] (Dkt. No. 81, Attach. 7, at ¶ 5 [Drake Decl.]; Dkt. No. 94, Attach. 6, at 60-61, 83-84 [attaching pages "60," "61," "83," and "84" of Drake Depo. Tr.]; Dkt. No. 98, Attach. 1, at ¶ 21 [Drake Suppl. Decl.].)

[99] (Dkt. No. 81, Attach. 7, at ¶ 5 [Drake Decl.]; Dkt. No. 98, Attach. 1, at ¶¶ 21, 23 [Drake Suppl. Decl.]; Dkt. No. 94, Attach. 6, at 26, 73, 74, 83, 84 [attaching pages "26," "73," "74," "83" and "84" of Drake's Depo. Tr.].)

41.     As part of his duties at OMH between 2007 to 2009, John Allen was the program manager for Central Files and Medical Records, which was responsible for the oversight and implementation of OMH responsibilities under, in part, the federal NICS Improvement Amendments Act of 2007.[100]

42.     The list of codes typed up by Ms. Drake for OMH in approximately 2008 included, in part, all admissions for emergency observation under N.Y. Mental Hygiene Law § 9.39 and all admissions under N.Y. Mental Hygiene Law § 9.37.[101]

43.     After the list of codes was typed up by Ms. Drake and approved by Mr. Tauriello, Ms. Drake provided the list of codes to other OMH employees.[102]

44.     OMH utilized a part of its existing data system to identify involuntary commitments to state hospitals that had to be reported for inclusion in NICS.  OHM's data system has an element that identifies an individual's "legal status" at the time of, and throughout, admission to a facility.[103]

45.     The program electronically gathers records relating to involuntary commitments nightly, which are put into an electronic file, encrypted and then transmitted electronically to

_____

[100]     (Dkt. No. 81, Attach. 3, at ¶ 4 [Allen Decl.]; Dkt. No. 94, Attach. 8, at 10 [attaching pages "10," "24," and "30" of Allen Depo. Tr.].)

[101]     (Dkt. No. 81, Attach. 8, at 2 [Ex. A to Drake Decl., attaching document entitled, "NICS Database Final"]; Dkt. No. 81, Attach. 7, at ¶ 5 [Drake Decl.]; Dkt. No. 98, Attach. 1, at ¶¶ 21, 22 [Drake Suppl. Decl.]; Dkt. No. 81, Attach. 3, at ¶ 29 [Allen Decl.].)

[102]     (Dkt. No. 94, Attach. 6, at 83, 84 [attaching pages "83" and "84" of Drake Depo. Tr.]; Dkt. No. 98, Attach. 1, at ¶ 21 [Drake Suppl. Decl.].)

[103]     (Dkt. No. 81, Attach. 3, at ¶ 11 [Allen Decl.]; Dkt. No. 94, Attach. 8, at 32, 44-56 [attaching pages "32" and "44" through "56" of Allen Depo. Tr.].)

DCJS, which then transmits the records electronically to the Criminal Justice Information

Services Division of the FBI for inclusion in the NICS database.[104]

46.     OMH began sending such computerized information for inclusion in the NICS

database in 2009.[105]

47.     When OMH sent computerized information for inclusion in the NICS database to

the FBI in 2009, Plaintiff's name and identifying information was included in the list of former

patients who had been committed.  Plaintiff's 1996 admission to the CNYPC was coded as "18"

and "23" in OMH's database.[106]

48.     Since 2009, OMH has been transmitting records of prohibited persons under the

Brady Act for inclusion in the NICS database of prohibited persons, and those records include all

admissions done pursuant to N.Y. Mental Hygiene Law § 9.37.[107]

Involvement of Ms. Drake

49.     In 2009, Ms. Drake believed that there was no such thing as an admission to a

mental hospital for observation only under N.Y. Mental Hygiene Law § 9.37, she believed that

all admissions to the CNYPC are commitments, and she continues to believe that at the present

time.

---

[104]     (Dkt. No. 81, Attach. 3, at ¶ 11 [Allen Decl.]; Dkt. No. 94, Attach. 8, at 65 [attaching page "65" of Allen Depo. Tr.].)

[105]     (Dkt. No. 81, Attach. 3, at ¶¶ 11-12, 14 [Allen Decl.]; Dkt. No. 94, Attach. 8, at 32, 34, 49, 50, 51, 56 [attaching pages "32," "34," "49" through "51," and "56" of Allen Depo. Tr.].)

[106]     (Dkt. No. 81, Attach. 3, at ¶¶ 11-13, 28, 29 [Allen Decl.].)

[107]     (Dkt. No. 81, Attach. 3, at ¶ 6 [Allen Decl.]; Dkt. No. 81, Attach. 7, at ¶ 62 [Drake Decl.].)

50.     The specific duties of the Senior Attorney in the OMH Office of Counsel (which position Ms. Drake held during the time in question) included, but were not limited to, providing legal advice and assistance to OMH Central Office policymakers and staff on a variety of issues in the following ways: (1) analyzing legal issues; (2) preparing legal memoranda in support of actions taken by program administrators; (3) advising policymakers and program administrators concerning the legality of their actions or determinations, and suggesting changes to ensure conformance with legal requirements; and (4) recommending changes in agency rules, regulations and policy statements to accommodate new legislation and court decisions.[108]

51.     At some point in 2011 or 2012, Ms. Drake had a meeting Mr. Tauriello and Mr. Allen about who at OMH should respond to telephone or written inquiries from people claiming that OMH had supplied incorrect information to NICS that caused them to be denied their applications to purchase a firearm.[109] At the conclusion of the meeting, it was determined that Ms. Drake would respond to calls and inquiries from the public about records sent by OMH for inclusion in NICS.[110]

52.     Ms. Drake's current duties as Senior Attorney also include providing legal advice and guidance on issues related to NICS and the Safe Act.

53.     OMH uses the term "NICS Appeals Office" when it corresponds or communicates

---

[108]     (Dkt. No. 94, Attach. 6, at 130 [Ex. 6 to Drake Depo. Tr., attaching Job Description for Senior Attorney, Grade 25]; Dkt. No. 81, Attach. 7, at ¶ 4 [Drake Decl.]; Dkt. No. 94, Attach. 6, at 11-45 [attaching pages "11" through "45" of Drake Depo. Tr.].)

[109]     (Dkt. No. 94, Attach. 6, at 28-29 [attaching pages "28" and "29" of Drake Depo. Tr.].)

[110]     (Dkt. No. 94, Attach. 6, at 29 [attaching page "29" of Drake Depo. Tr.]; Dkt. No. 98, Attach. 1, at ¶ 23 [Drake Suppl. Decl.].)

with the public about inquiries concerning denials of applications to purchase firearms as the result of a NICS background check. The OMH appeals office is located at 44 Holland Avenue, Albany, NY, but there are no people designated as working in the NICS appeals office.[111]

54.     Ms. Drake works on behalf of the NICS appeals office.[112]  As stated earlier, Ms. Drake responds to inquiries from the public about records sent by OMH for inclusion in NICS.[113]

55.     Ms. Drake's designation as the person who would respond to inquiries from the public about records sent by OMH for inclusion in NICS was never put in writing;[114] and there are no regulations, procedures, manuals or guidelines about how to handle such inquiries from the public.[115]

56.     Moreover, OMH has no written regulations, policies, procedures, guidelines, or other documents about what OMH needs to do in order to comply with NICS reporting requirements, but rather all such processes are verbal.[116]

57.     N.Y. Mental Hygiene Law § 7.09, in part, authorizes OMH to  collect, retain or

---

[111]     (Dkt. No. 94, Attach. 6, at 17-19 [attaching pages "17" through "19" of Drake Depo. Tr.].)

[112]     (Dkt. No. 94, Attach. 6, at 17-18 [attaching pages "17" and "18" of Drake Depo. Tr.].)

[113]     (Dkt. No. 94, Attach. 6, at 23-30 [attaching pages "23" through "30" of Drake Depo. Tr.]; Dkt. No. 98, Attach. 1, at ¶ 23 [Drake Suppl. Decl.].)

[114]     (Dkt. No. 94, Attach. 6, at 29-30 [attaching pages "29" and "30" of Drake Depo. Tr.].)

[115]     (Dkt. No. 94, Attach. 6, at 30 [attaching page "30" of Drake Depo. Tr.].)

[116]     (Dkt. No. 94, Attach. 6, at 50-51 [attaching pages "50" and "51" of Drake Depo. Tr.]; Dkt. No. 94, Attach. 8, at 35-36 [attaching pages "35" and "26" of Allen Depo. Tr.].)

modify data or records, and to transmit such data or records to DCJS or to the Criminal Justice Information Services Division of the FBI for purposes of responding to queries to the NICS regarding attempts to purchase or otherwise take possession of firearms.[117]

58.     Ms. Bosco had no authority to change the report that made to OMH, or the data in the NICS system, regarding Plaintiff's 1996 admission to the CNYPC.[118]

49.     Ms. Bosco's letter to Plaintiff dated July 22, 2013, stated in part, "You were involuntarily committed to the CNYPC on August 30th, 1996 through September 4th, 1996."

60.     After Ms. Bosco spoke to Plaintiff on the phone, Ms. Bosco called Ms. Drake for advice about how to respond to his claim that he had not been committed and emailed the text of her draft letter to Ms. Drake for advice before it was mailed to Plaintiff; and she relied on Ms. Drake for advice about how to respond to Plaintiff.[119]

61.     Ms. Drake saw, and approved the content of, the letter from Ms. Bosco to Plaintiff dated July 22, 2013, in email format before Ms. Bosco mailed it to Plaintiff.[120]

62.     Plaintiff's attorney's letter to the OMH Appeals Office dated July 26, 2013, asserted that OMH erroneously failed to distinguish between a patient who was admitted for observation only and a patient who was "committed" within the meaning of 18 U.S.C. §

---

[117]     N.Y. Mental Hygiene Law § 7.09(j); 14 NYCRR § 543.1(c).

[118]     (Dkt. No. 81, Attach. 5, at ¶ 22 [Bosco Decl.].)

[119]     (Dkt. No. 94, Attach. 5, at 32-33 [attaching pages "32" and "33" of Bosco Depo. Tr.].)

[120]     (Dkt. No. 94, Attach. 7, at 2 [attaching Def. Drake's Response to Plaintiff's First Supplemental Interrogatories Nos. 4 and 5, dated Sept. 19, 2016]; Dkt. No. 94, Attach. 5, at 32-33 [attaching pages "32" and "33" of Bosco Depo. Tr.].)

922(g)(4).[121]

63.     Ms. Drake obtained Plaintiff's records from the CNYPC and reviewed them to determine whether the information that was reported to NICS was reflected in Plaintiff's medical records.[122]

64.     Ms. Drake's review of Plaintiff's records "confirmed" that he had been involuntarily committed to the CNYPC, and that therefore the information provided to NICS was accurate.[123]

65.     If the hospital records report the legal status of the patient (during an admission to the hospital) as an involuntary commitment, then OMH will not dispute the hospital's determination as to the legal status of that admission. Instead, the patient would have to address that issue with the admitting hospital.[124]  However, Ms. Bosco (the Executive Director of the the CNYPC) states that she had no authority to change either the report that was made to OMH regarding Plaintiff's 1996 admission or the data in the NICS system regarding that 1996 admission.[125]

66.     Plaintiff's attorney's letter to the OMH Appeals Office dated July 26, 2013, asserted that OMH erroneously determined that Plaintiff's admission to the CNYPC for

---

[121]     (Dkt. No. 1, Attach. 1, at 25-30 [Ex. I to Plf.'s Compl., attaching letter of July 26, 2013]; Dkt. No. 81, Attach. 8, at 11-13 [Ex. E to Drake Decl., attaching letter responding to letter of July 23, 2013].)

[122]     (Dkt. No. 81, Attach. 7, at ¶ 43 [Drake Decl.].)

[123]     (Dkt. No. 81, Attach. 7, at ¶¶ 44, 54 [Drake Decl.].)

[124]     (Dkt. No. 81, Attach. 3, at ¶ 20 [Allen Decl.].)

[125]     (Dkt. No. 81, Attach. 5, at ¶ 22 [Bosco Decl.].)

observation only under N.Y. Mental Hygiene Law § 9.37 in fact constituted a "committed" within the meaning of 18 U.S.C. § 922(g)(4).[126]

67.     The FBI's letter to Plaintiff dated March 4, 2013, regarding his "Firearm Appeal," advises persons who have been disqualified from purchasing a firearm of the following, in part:

> If you wish to challenge the accuracy of the record upon which the denial is based, it is suggested that you submit the personal information below directly to the agency of the record. The name and location of the agency that holds the denying record/information is as follows:

> NICS Appeals Office, OMH
> 14 Holland Avenue
> Albany, NY 12229[127]

68.     There is no appeals process at OMH.[128]

69.     In response to the letter of July 26, 2013, from Plaintiff's attorney, Ms. Drake sent a letter dated September 6, 2013, on letterhead of Counsel to the OMH, stating in part as follows:

> This office is in receipt of your letter dated July 26, 2013 concerning Frederick Phelps. . . .

> Mr. Phelps was involuntarily committed to CNYPC pursuant to Section 9.37 [of the] MHL and Section 506 of the Correction Law and[,] therefore, identifying information concerning this involuntary commitment was sent to the NICS database by OMH as required by law. . . .

> [T]he OMH followed the procedure outlined in Section 9.37 during the

---

[126]     (Dkt. No. 1, Attach. 1, at 25-30 [Ex. I to Plf.'s Compl., attaching letter of July 26, 2013]; Dkt. No. 81, Attach. 8, at 11-13 [Ex. E to Drake Decl., attaching letter responding to letter of July 23, 2013].)

[127]     (Dkt. No. 94, Attach. 6, at 131 [Ex. 7 to Drake Depo. Tr.].)

[128]     (Dkt. No. 94, Attach. 6, at 24-25 [attaching pages "24" and "25" of Drake Depo. Tr.].)

involuntary commitment of Mr. Phelps and such procedure meets the standard outlined in *Waters*, 20 F3d 29 (2d Cir. 1994).

It is the position of OMH[] that Frederick Phelps admission to CNYPC pursuant to [Section] 9.37 [of the] MHL was a commitment to a mental health institution as defined under federal law.[129]

## 2. Summary of Plaintiff's Memorandum of Law and State Defendants' Opposition Memorandum of Law

Generally, Plaintiff's memorandum of law and the State Defendants' opposition memorandum of law assert the arguments summarized above in Parts I.D.3. and I.D.4. of this Decision and Order.

## 3. Summary of Plaintiff's Reply Memorandum of Law

Generally, in his reply memorandum of law, in addition to repeating previously asserted arguments, Plaintiff asserts five new arguments: (1) his Rule 7.1 Statement and Rule 7.1 Responses comply with N.D.N.Y. 7.1(a)(3) by "citing and/or quoting deposition testimony"; (2) the State Defendants conceded that Plaintiff was held pursuant to "initial hold periods" without explaining the purpose of the "initial hold periods," ignoring the obvious fact that the purpose was observation and evaluation; (3) Defendant Drake's Supplemental Declaration testimony that she has no authority to implement the relief sought should be precluded because it contradicts her prior deposition testimony that she was intimately involved in setting up and implementing the OMH's response to the Brady Improvement Act in 2008, and setting up, implementing, and administering the NICS appeals process for OMH since 2012; (4) similarly, her denial of such authority contradicts her Supplemental Declaration testimony that she could authorize OMH to

_____

[129]     (Dkt. No. 81, Attach. 8, at 11-13 [Ex. E to Drake Decl., attaching letter from Ms. Drake letter to Attorney Oliver dated Sept. 6, 2013].)

make a correction in the NICS database; and (5) Defendant Drake's strenuous assertion in her

Supplemental Declaration that the NICS Improvement Amendments Act of 2007 did not require

New York State to provide an appeals process (for prospective purchasers of firearms) is false,

because the regulations clearly reference an appeals process, which is merely "a formal procedure

to challenge the denial of a firearm transfer." (Dkt. No. 100 [Plf.'s Reply Memo. of Law].)

## II.     GOVERNING LEGAL STANDARDS

### A.     Legal Standard Governing Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is

such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).[130] As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S.

---

[130]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[131] Of course, when a non-movant fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has failed to properly respond to that statement,[132]

Similarly, in this District, where a non-movant has failed to respond to a movant's

---

[131]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[132]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[133] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

*novo* review).

### B. Legal Standards Governing Plaintiff's Claims and Defendants' Defenses

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims and Defendants' defenses in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties. (Dkt. No. 79, Attach. 2 [Fed. Defs.' Memo. of Law]; Dkt. No. 94, Attach.

---

[133]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

10 [Plf.'s Opp'n Memo. of Law]; Dkt. No. 97 [Fed. Defs.' Reply Memo. of Law]; Dkt. No. 81, Attach. 10 [State Defs.' Memo. of Law]; Dkt. No. 98, Attach. 3 [State Defs.' Reply Memo. of Law]; Dkt. No. 100 [Plf.'s Reply Memo. of Law].)

## III. ANALYSIS

### A. Federal Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment Against Federal Defendants

After carefully considering the matter, the Court grants the Federal Defendants' motion for summary judgment, and denies Plaintiff's cross-motion for summary judgment against the Federal Defendants, largely for the reasons stated in the Federal Defendants' memoranda of law. *See, supra,* Parts I.B.2., I.B.4. and I.C.2. of this Decision and Order. To those reasons, the Court adds the following analysis.

Plaintiff is correct that in its Decision and Order of March 26, 2015, the Court stated that "[a]n admission pursuant to N.Y. Mental Hyg. Law § 9.39 does not appear to constitute a 'commitment' to a mental institution for purposes of 18 U.S.C. § 922(g)(4) . . ."; however, the Court hastened to add that it was expressing "no opinion as to the success of the Federal Defendants' reliance on that stay [in the hospital] in any summary judgment motion that may be filed." *Phelps v. Bosco*, 13-CV-1510, 2015 WL 1399051, at *12 (N.D.N.Y. March 26, 2015) (Suddaby, J.). Having had the benefit of a more-complete record and set of briefs, the Court reconsiders its prior ruling.

It true that 27 C.F.R. § 478.11 defines "committed to a mental institution" as "[a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority." It is also true that 27 C.F.R. § 478.11 provides that "[t]he term 'commitment] does

not include a person in a mental institution for observation . . . ."  However, here, Plaintiff's 2005 admission to Columbia Memorial Hospital pursuant to N.Y. Mental Hygiene Law § 9.39 was not merely for "observation": Plaintiff's admission was for observation, *care and/or treatment.  See, supra,* Statement of Fact Nos. 2, 5 and 5 in Part I.B.1. of this Decision and Order; *see also, supra,* Statement of Fact Nos. 5, 6, 13-16 in Part I.C.1. of this Decision and Order.

Granted, Plaintiff certainly received observation.  However, the fact that Plaintiff refused psychiatric medication during his involuntary stay at Columbia Memorial Hospital (and likely would have prevailed in a *Rivers* Hearing to force him to take psychiatric medications) does not mean he did not also receive mental-illness care and/or treatment.  Similarly, the fact that Dr. Plotkin discharged him five days short of the fifteen-day maximum period of retention does not mean he did not also receive mental-illness care and/or treatment.

The record contains evidence establishing that, during the course of his ten-day stay at Columbia Memorial Hospital, Plaintiff engaged in, and benefitted from, both individual and group psychotherapy.  (Dkt. No. 80, Attach. 2, at 4 [Discharge Summary, stating, in part, "During the course of the patient's hospitalization, he did engage seemingly productively in individual and group psychotherapy.  He was able to see that the methods he had employed over the years with regards to dispute resolution with governmental officials was inappropriate and caused more problems than they solve."].) Under the circumstances, the Court finds that Plaintiff's admission and retention at Columbia Memorial Hospital was for care and/or treatment, as well as for observation.[134]

---

[134]    Had Plaintiff prevailed at a court hearing (i.e., had he obtained a ruling that there was no reasonable cause to believe that he had a mental illness for which immediate inpatient care and treatment in a hospital was appropriate), or had the staff of Columbia Memorial

The Court notes that it does *not* base its decision on the purported invalidity of Plaintiff's admission to, and retention, at Columbia Memorial Hospital for ten days. Plaintiff does not appear to argue that his requested court hearing was delayed.[135] Nor does Plaintiff appear to argue that N.Y. Mental Hygiene Law § 9.39(a) requires that the first physician render a finding (under that section) was a "member of the psychiatric staff of the hospital" (as opposed to only a "staff physician of the hospital"). Nor does Plaintiff appear to argue that the finding of Dr. Plotkin (apparently a psychiatrist) preceded rather than followed the finding of Dr. Tobey (a staff physician).[136]

Rather, Plaintiff argues that the finding of Dr. Plotkin could not constitute a confirmatory finding (for purposes of N.Y. Mental Hygiene Law § 9.39) because it was not rendered through

---

Hospital intentionally released Plaintiff before the occurrence of his court hearing in order to moot that hearing (and thus escape the consequences of it), the Court might be inclined to reach a different conclusion. *Cf. Christine Q.Q. v. Capital Dist. Psychiatric Ctr.*, 487 N.Y.S.2d 167, 168 (N.Y. App. Div., 3d Dep't 1985) (dismissing appeal from order denying as moot patient's application for a hearing pursuant to N.Y. Mental Hyg. Law § 9.39 because she was no longer being confined to psychiatric center pursuant to N.Y. Mental Hyg. Law § 9.39). However, that issue is not before the Court under the circumstances.

[135]   The hospital director apparently received Plaintiff's request on Saturday, February 26; however, no hearing had yet occurred by the time Plaintiff withdrew his request on Friday, March 4. The relevant portion of N.Y. Mental Hygiene Law § 9.39(a) states that "a hearing shall be held as herein provided as soon as practicable but in any event not more than five days after such request is received." It is unclear to the Court whether (1) the word "received" means "received" by the director of the hospital or "received" by the supreme court or county court in the county where such hospital is located, (2) the director forwarded the request to the supreme court or county court on Monday, February 28, or some other time, and (3) the words "five days" means five business days or five calendar days.

[136]   It appears that Dr. Tobey's finding occurred at approximately 4:15 p.m. on February 25, 2005, while Dr. Plotkin's finding occurred at approximately 5:30 p.m. on that day. (Dkt. No. 80, Attach. 2, at 10 [Psychiatrist's Admitting Orders, indicating that the order came from "Dr. Plotklin" at the time of "1730"].)

the completion of the form entitled, "Certificate of Examining Physician," as expressly required by "Emergency Admission" form (completed by Dr. Tobey). Granted, Plaintiff makes a good point to the extent that he argues that the New York State OMH is employing a form that misleads patients into believing that no confirmatory finding has been rendered until the form "Certificate of Examining Physician" has been completed by a psychiatrist. However, an administrative agency's form does not constitute a law; a statute does so. Here, the Court can find nothing in the statute that requires that the confirmatory finding of a psychiatrist be rendered through the form "Certificate of Examining Physician." Moreover, the Court has trouble concluding that the OMH's misstatement should somehow estop the director of Columbia Memorial Hospital from continuing to retain Plaintiff from February 27 (forty-eight hours after his admission) to March 7 (the date of his discharge), given Plaintiff's lack of detrimental reliance on that misstatement.[137] The Court certainly cannot conclude that the OMH misstatement should *vicariously* estop the Federal Defendants, despite the fact that they played no role in the misstatement.[138]

For all of these reasons, the Court grants the Federal Defendants' motion for summary judgment, and denies Plaintiff's cross-motion for summary judgment against the Federal

---

[137] The Court notes that, on the morning of February 26, Plaintiff requested a court hearing. By the end of February 26, Plaintiff was on notice that he was being kept past the forty-eight hour period; if he believed that no confirmatory finding by a psychiatrist had been rendered by then (and that he was being wrongfully withheld thereafter), he should not have rescinded his request for a hearing on March 4. Moreover, this is not a case in which no finding was rendered after Dr. Tobey's finding; one was rendered, by Dr. Plotkin, later in the day on February 25.

[138] *See* Black's Law Dictionary at 629 (9th ed) (defining "estoppel" as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before . . . .").

Defendants.

**B.    State Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment Against State Defendants**

After carefully considering the matter, the Court grants the State Defendants' motion for summary judgment, and denies Plaintiff's cross-motion for summary judgment against the State Defendants.  The Court bases this ruling on the State Defendants' first argument and part of their fourth argument[139] in their memorandum of law, and the third and fourth arguments in their reply memorandum of law.  *See, supra,* Parts I.D.2. and I.D.4. of this Decision and Order.  To those reasons, the Court adds the following analysis.

The Court finds that Plaintiff's 2005 commitment to Columbia Memorial Hospital provides an independent disqualifying event under 18 U.S.C. § 922(g)(4).  *See Ross v. Fed. Bureau of Alcohol, Tobacco and Firearms*, 807 F. Supp.2d 362, 373 (D. Md. 2011) (finding that plaintiff lacked standing to challenge a denial under 18 U.S.C. § 922[g][1], because he had been denied a firearm under a different part of the statute, namely 18 U.S.C. § 922[g][9], which restricts firearm possession to those convicted of a misdemeanor of domestic violence); *Fratus v. Devine*, 96-CV-0551, 1997 WL 33547361, at *3 (D. R.I. Aug. 25, 1997) (finding plaintiff's claim for injunctive relief under 18 U.S.C. § 922[g][1] to be moot because "her intervening convictions for assault with a dangerous weapon disqualify her from purchasing a firearm," and further finding that "it would defy logic and common sense to permit a person who is prohibited

---

[139]    More specifically, the Court accepts the State Defendants' argument that Plaintiff has failed to establish a claim against the State Defendants under 42 U.S.C. § 1983 because he has not established that any action by the State Defendants caused him injury (given his involuntary commitment to Columbia Memorial Hospital in 2005 pursuant to N.Y. Mental Hygiene Law § 9.39).

from obtaining a firearm to recover damages from someone who prevents that person from obtaining it"); *cf. Brown v. Shoe*, 15-CV-2730, 2016 U.S. Dist LEXIS 54136, at *16-17 (D. Colo. Apr. 22, 2016) (finding that plaintiff could not challenge adjudication that he was a "Mental Defective" under 18 U.S.C. § 925A where "the basis of the denial was his felonious background–which was proper pursuant to the law").

The Court rejects Plaintiff's argument that the State Defendants cannot rely on his 2005 commitment to Columbia Memorial Hospital because OMH did not report that commitment to the NICS database before March 4, 2013 (when the FBI informed Plaintiff that 18 U.S.C. § 922[g][4] prohibited Plaintiff from possessing a firearm). By its plain language, the relevant statute provides, in part, that "[i]t shall be unlawful for any person . . . who has been committed to a mental institution . . . to . . . possess . . . any firearm or ammunition . . . ." 18 U.S.C. § 922(g)(4). The statute does *not* insert the words "and reported to NICS as having been so committed" after "who has been committed to a mental institution." As a result, OMH need not have reported to NICS Plaintiff's 2005 commitment before March 4, 2013, in order for the State Defendants to rely on it now. *See Fratus*, 1997 WL 33547361, at *3 (finding that plaintiff's claim under 18 U.S.C. § 922[g][1] based on, *inter alia*, several misdemeanor convictions and an outstanding misdemeanor charge of assault before August 14, 1996, was moot because, after August 14, 1996, plaintiff was "convicted on two felony counts of assault with a dangerous weapon arising from an unrelated incident").

The Court also rejects Plaintiff's argument that 18 U.S.C. § 925A is broad enough to enable him to challenge the mere providing of erroneous information by OMH to the NICS database. Again, by its plain language, the relevant statute provides that "[a]ny person denied a

firearm . . . *due to* the provision of erroneous information relating to the person . . . may bring an

action against the State or political subdivision responsible for providing the erroneous

information, or responsible for denying the transfer, or against the United States, as the case may

be, for an order directing that the erroneous information be corrected or that the transfer be

approved, as the case may be." 18 U.S.C. § 925A [emphasis added].  As a result, the erroneous

information must not merely be provided but must *cause* the denial.  *Id*.[140]  More specifically, the

erroneous information must have caused, *and continue to cause*, the denial.  *See Wilson v. United*

*States*, 14-CV-3023, 2014 WL 6997770, at *2 (E.D. Wash. Dec. 10, 2014) (finding plaintiff's

claim pursuant to 18 U.S.C. § 925A to be moot because, four-and-a-half months after he filed his

action, NICS cleared him to purchase a firearm).[141]

Here, OMH sent to NICS the report of Plaintiff's 2005 commitment at some point in

2013.  (Dkt. No. 81, Attach. 3, at ¶ 30 [Allen Decl.]; *cf.* Dkt. No. 81, Attach. 7, at ¶¶ 63, 65

[Drake Decl.].)[142]  It is unclear whether OMH sent the report before or after this action was filed

---

[140]     *Cf. Enos v. Holder*, 10-CV-2911, 2011 WL 2681249, at *4-5 (E.D. Cal. July 8, 2011) (dismissing claims of eight out of nine plaintiffs under 18 U.S.C. § 925A because they failed to allege that they have attempted to purchase a gun and have been denied, or that they face imminent prosecution for possessing a gun); *Ross*, 807 F. Supp.2d at 374 ("[F]or Ross to state a claim against Defendants under [18 U.S.C.] § 925A, he must demonstrate that the NICS improperly provided a 'Denied' response.").

[141]     *Cf. Fratus*, 1997 WL 33547361, at *3 (finding plaintiff's claim for injunctive relief under 18 U.S.C. § 922[g][1] to be moot because "her intervening convictions for assault with a dangerous weapon disqualify her from purchasing a firearm," and further finding that "it would defy logic and common sense to permit a person who is prohibited from obtaining a firearm to recover damages from someone who prevents that person from obtaining it").

[142]     The Court notes that the federal Bureau of Alcohol, Tobacco, Firearms and Explosives had notice of that Plaintiff's 2005 admission to Columbia Memorial Hospital constituted an involuntary commitment pursuant to 18 U.S.C. § 922(g)(4) by at least March 17, 2005.  (Dkt. No. 17, Attach. 2, at 2-4 [Criminal Compl. and Affid. of Special Agent Mark P.

on December 6, 2013. (Dkt. No. 1.) However, it cannot be reasonably disputed that Plaintiff's current denial of a firearm may be, and is, caused by his 2005 commitment. (*See, e.g.,* Dkt. No. 81, Attach. 3, at ¶ 30 [Allen Decl.]; Dkt. No. 81, Attach. 7, at ¶ 66 [Drake Decl.]; Dkt. No. 17, Attach. 2, at 2-3 [Criminal Compl. dated March 17, 2005, charging Plaintiff with violating 18 U.S.C. § 922(g)(4) based on his 2005 commitment to Columbia Memorial Hospital]; Dkt. No. 97, at 2 [attaching page "1" of Fed. Defs.' Reply Memo. of Law, arguing that, "because Plaintiff remains under a firearms disability, NICS correctly denied Plaintiff's application for a firearm"].) Simply stated, the controversy over Plaintiff's 1996 admission to the CNYPC is moot.

Having said that, the Court notes that it continues to reject the argument that a person has been "committed" to a mental institution for purposes of 18 U.S.C. § 922(g)(4) in the following circumstances: (1) a *non-psychiatric* staff physician of the hospital has found that the person has a mental illness (for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others) pursuant to N.Y. Mental Hygiene Law § 9.37; (2) over the next 72 hours, the person has received no mental-illness care or treatment (and no court hearing);[143] and (3) then, within 72 hours of admission, a *psychiatric* staff physician has rendered a finding contrary to the non-psychiatric staff physician's

---

Meeks].)

[143] The Court notes that it has found no admissible record evidence establishing that Plaintiff received any mental-illness care or treatment (e.g., through psychiatric medication or psychotherapy) during his 72-hour stay at the CNYPC in 1996. (*See, e.g.,* Dkt. No. 82, at 52-54 [Ex. A to Kerwin Affid., attaching Discharge Summary dated Sept. 4, 1996, which does not indicate that Plaintiff received any psychiatric medication or psychotherapy at the CNYPC].) The Court notes also that, contrary to Plaintiff's argument that "[d]uring his 1996 admission to CNYPC[] [he] requested a judicial hearing" (Dkt. No. 100, at 3 [attaching page "2" of Plf.'s Reply Memo. of Law]), the Court can find no admissible evidence of such a request in the record.

finding and discharged the person.  Under such a circumstances, the admission appears to have

effectively been for observation under 18 U.S.C. § 922(g)(4) (regardless of the intended purpose

of the admission under N.Y. Mental Hygiene Law § 9.37).

Because the Court need not reach the State Defendants' alternative arguments for

dismissal (and Plaintiff's arguments for summary judgment on his claims against the State

Defendants), the Court will not do so, other than to note that, even if the Court were to reject the

above-described conclusions, the Court would, at the very least, dismiss Plaintiff's claims against

Defendant Bosco as voluntarily withdrawn (or abandoned) and lacking evidentiary support for

the reasons stated by the State Defendants.

**ACCORDINGLY**, it is

**ORDERED** that the Federal Defendants' motion for summary judgment (Dkt. No. 79) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment against the Federal

Defendants (Dkt. No. 94) is **DENIED**; and it is further

**ORDERED** that the State Defendants' motion for summary judgment (Dkt. No. 81) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment against the State

Defendants (Dkt. No. 94) is **DENIED**; and is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**, and the Clerk of

Court shall enter Judgment for Defendants and close this action.

Dated:          February 1, 2017
                Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge